**EXXON MOBIL CORPORATION,**
Appellant

v.

**KINDER MORGAN OPERATING L.P. "A" f/k/a Enron Liquids Pipeline Operating Limited Partnership, Kinder Morgan, Inc.; Oneok Bushton Processing, Inc. f/k/a Enron Gas Processing Co. and KN Processing, Inc.; and Enron Liquids Pipeline Co. n/k/a Kinder Morgan GP, Inc., Appellees.**

No. 14–04–01060–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 21, 2006.

Roger D. Townsend, Andrew McCord Gilchrist, Gregory T. Kenney, Jennifer R. Tillison, Kenneth Tekell, Todd A. Kissner, Houston, for appellants.

Erin Glenn Busby, J. Clifford Gunter III, Neil Emerson Giles, Warren W. Harris, Houston, for appellees.

Panel consists of Chief Justice HEDGES, Justice YATES, and Senior Chief Justice MURPHY.*

## OPINION

ADELE HEDGES, Chief Justice.

Exxon Mobil Corporation appeals from a take nothing judgment in its lawsuit against Kinder Morgan Operating L.P. "A" f/k/a Enron Liquids Pipeline Operating Limited Partnership, Kinder Morgan, Inc.; ONEOK Bushton Processing, Inc. f/k/a Enron Gas Processing Co. and KN Processing, Inc.; and Enron Liquids Pipeline Co. n/k/a Kinder Morgan GP, Inc. ("appellees").[1] In 1987, Exxon Mobil and appellees entered into a Gas Processing Agreement under which appellees agreed to process Exxon Mobil's natural gas. In

---

* Senior Chief Justice Paul Murphy sitting by assignment.

1. Appellees are various related entities, each of which participated in some fashion in the agreement underlying Exxon Mobil's claims. The agreement was originally entered into by Mobil, prior to its merger with Exxon. Because the parties make no arguments concerning or depending upon when any particular entity was involved in performance of the contract, we shall use the terms "appellees" and "Exxon Mobil" to refer to any or all of the respective parties.

the present action, Exxon Mobil sued appellees claiming, inter alia, breach of contract, conversion, fraudulent inducement, and fraudulent concealment, all relating to the gas processing relationship. Exxon Mobil's primary claim is that appellees did not provide it with all of the propane to which it was entitled from the natural gas. The trial court granted a directed verdict favoring appellees on the conversion claim. The jury returned a verdict favoring appellees on all remaining claims. The trial court entered a take nothing judgment in favor of appellees. In three issues, Exxon Mobil contends that (1) the jury's verdict on the breach of contract claim was against the great weight and preponderance of the evidence; (2) the trial court erred in granting a directed verdict on the conversion claim; and (3) the trial court commented on the weight of the evidence in front of the jury. Under each issue, Exxon Mobil requests that we reverse and remand for a new trial. We affirm.

### Background

In 1987, Exxon Mobil produced natural gas from the Hugoton Field in southwest Kansas. Appellees operated a gas processing plant in Bushton, Kansas. The parties entered into a Gas Processing Agreement ("GPA"), under which appellees agreed to process Exxon Mobil's Hugoton Field gas.[2] The GPA called for appellees to extract liquid and liquefiable hydrocarbons, such as propane, butane, and natural gasoline, out of the natural gas stream. These extracted hydrocarbons were then to be provided to Exxon Mobil as "plant products" based on certain specified percentages. The GPA also required appellees to perform "BTU control activities" so that the remaining natural gas, or "Residue Gas," leaving the plant would contain an average of no less than 950 BTUs per cubic foot.[3] In order to account for the BTU control activities, the percentage of extracted propane that the GPA allots to Exxon Mobil was expressly made variable. As will be discussed in detail below, Exxon Mobil maintains that the GPA required appellees to vary the amount of Exxon Mobil's own propane extracted or reinjected in order to meet the BTU requirements in the residue gas stream. Appellees assert that the GPA permitted them to vary the amount of propane provided to Exxon Mobil as a plant product to account for the BTU control activities but did not require appellees to actually use Exxon Mobil's propane for such activities.[4]

The parties operated under the GPA until 1997, when they signed Amendment No. 3. This amendment removed the variability of the percentage of propane received by Exxon Mobil in exchange for a fixed percentage, which was lower than the potential amount in the original agreement but considerably higher than what Exxon Mobil actually had been receiving. The negotiations leading to Amendment No. 3

---

**2.** The gas produced by Exxon Mobil from the Hugoton Field was immediately comingled with the natural gas of other producers as soon as it entered the pipeline operated by Exxon Mobil's transporter. Thus, the gas that entered and the gas that exited appellees' Bushton plant was always comingled gas from several producers. In light of this fact, the GPA required all measurements and compositional analysis to be done at the wellhead before Exxon Mobil's gas entered the comingled stream.

**3.** BTUs ("British Thermal Units") are units of measuring heating capacity. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 279, 287 (1993).

**4.** The parties agree that under the GPA, to the extent BTUs in the residue gas needed to be enhanced, the amount of propane attributable to Exxon Mobil as a plant product was to be reduced.

were prompted by auditing concerns raised by Exxon Mobil. Exxon Mobil asserted that appellees were required to measure propane at the tailgate of the plant, whereas appellees apparently had been measuring in the middle of the plant prior to extraction of inert compounds (such as helium and nitrogen), the presence of which would decrease the share of propane attributable to Exxon Mobil. In its brief, Exxon Mobil acknowledges that the signing of Amendment No. 3 settled the claims relating to this alleged allocation discrepancy.

Exxon Mobil contends that its auditors ultimately discovered additional allocation discrepancies due to appellees' measuring propane prior to the extraction of water, helium, and nitrogen. On September 1, 2000, Exxon Mobil filed this lawsuit. During the discovery process related to these initial claims, Exxon Mobil asserts that it learned that appellees had been appropriating vast quantities of propane that should have been provided to Exxon Mobil. In short, Exxon Mobil contends that appellees varied the amount of propane attributable to Exxon Mobil to account for BTU control but did not actually use Exxon Mobil's propane for BTU control. Instead, appellees extracted the propane attributable to Exxon Mobil and swapped it for methane, which was used to raise the BTUs of the residue gas stream as necessary. Appellees, or entities related to appellees, then sold the propane for a profit. Exxon Mobil claims that the difference between the value of the propane it was

due and the value of the propane it received was around $37 million.

Thus, the fundamental point of contention in this lawsuit is as follows: did the provisions in the GPA mandating the variance of the amount of propane attributable to Exxon Mobil require that its propane actually be used for BTU control, or did those provisions merely provide a method of accounting for BTU control without requiring that only Exxon Mobil's propane be used for such control activity?

The trial court granted a directed verdict favoring appellees on Exxon Mobil's conversion claim. The breach of contract, fraudulent inducement, and fraudulent concealment claims were submitted to the jury, which returned a verdict favoring appellees on those claims. Accordingly, the trial court entered a take nothing judgment favoring appellees. On appeal, Exxon Mobil contends that (1) the jury's verdict on breach of contract was against the great weight and preponderance of the evidence; (2) the trial court erred in granting a directed verdict on the conversion claim; and (3) the trial court commented on the weight of the evidence in front of the jury.[5]

### Breach of Contract

■ In its second issue, Exxon Mobil contends that the jury's verdict on the breach of contract claim was against the great weight and preponderance of the evidence.[6] We utilize the normal standards of review in considering this factual sufficiency challenge. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001).

5. Although the GPA specified that the laws of Kansas would govern its interpretation, the parties agree that there are no material differences between Texas law and Kansas law relevant to matters at issue in this case. Accordingly, we will analyze the issues in accordance with Texas law. *See, e.g., Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56,

69–70 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

6. We will first discuss Exxon Mobil's second issue, concerning breach of contract. We will then discuss its first issue, concerning conversion.

Exxon Mobil specifically attacks the jury's negative answer to Question No. 2 in the charge, which reads as follows:

### QUESTION NO. 2

Did any defendant fail to comply with the Gas Processing Agreement?

In answering this question, you are to consider only whether [Exxon Mobil] received the number of gallons of plant products that it was entitled to under the terms of the 1987 Gas Processing Agreement.

This question clearly refers to a particular section of the contract, paragraph 10.03, which provides:

10.03 The number of gallons of each Plant Product to which [Exxon Mobil] is entitled shall be determined by multiplying the theoretical gallons of each such Plant Product by the applicable recovery factor shown below, and the fees therefor shall be calculated pursuant to paragraph 11.01 hereof.

| | Without BTU Control |
|---|---|
| Ethane - | 0% |
| Propane - | up to 88% * |
| Iso–Butane - | 98% |
| Normal Butane - | 98% |
| Natural Gasoline - | 95% |

* varied, as necessary, in order to meet Mobil's Transporter's F.E.R.C. BTU tariff requirements.

The GPA defined "plant products" as "the hydrocarbons in liquid and liquefiable form extracted and saved from Gas processed at the Plant." Propane is the only plant product that Exxon Mobil contends it was entitled to but did not receive in the correct quantity. Under paragraph 10.03, Exxon Mobil was entitled to as much as 88% of the propane theoretically produced from its gas minus the amount that would be required to enhance the BTUs of the residue gas.[7]

Exxon Mobil's theory is that appellees breached the GPA by using methane instead of propane to enhance BTUs in the residue gas stream, retaining the propane that should have been used for BTU control, and selling that propane for a profit. However, even if Exxon Mobil is correct that appellees should have used propane attributable to Exxon Mobil and not methane from another source for BTU control, the propane in question should not have been "extracted and saved" as a plant product; it should have been left in (or reinjected into) the residue gas stream. In other words, it was logical for the jury to conclude that under the GPA, Exxon Mobil would not have been entitled to receive as a plant product the propane that it claims should have been used for BTU control. At most, Exxon Mobil would have been entitled to have the propane left in or reinjected into the residue gas stream. Question No. 2, the sole breach of contract question in the charge, permitted the jury to find a breach of contract only if Exxon

7. The parties dispute whether the trial court found the contract to be ambiguous or unambiguous. The trial court did not expressly rule either way. It instructed the jury that it should find a breach of contract only if Exxon Mobil did not get all the plant products to which it was entitled. Exxon Mobil does not contend that this charge was in error. Therefore, in assessing the factual sufficiency of the evidence, we examine the evidence in light of the charge as submitted. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.2000). To the extent that our review requires us to interpret the contract, our primary concern is ascertaining the true intent of the parties. *Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.*, 157 S.W.3d 462, 465 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (citing *Heritage Res., Inc. v. Nations-Bank*, 939 S.W.2d 118, 121 (Tex.1996)). We examine the entire agreement when interpreting a contract, giving effect to all the contract's provisions so that none are rendered meaningless. *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex.2002). We assign terms their plain, ordinary, and generally accepted meanings unless the instrument shows that the parties used them in a technical or different sense. *Heritage Res.*, 939 S.W.2d at 121.

Mobil proved that it did not get all of the *plant products* to which it was entitled. The charge did not permit the jury to find a breach of contract simply on evidence that methane was used instead of Exxon Mobil's propane to control BTUs in the residue gas stream.[8] Exxon Mobil does not allege charge error on appeal. Under the GPA, it was entitled to two things: (1) a residue gas stream with 950 BTU and (2) plant products, including propane in excess of the amount that would be required to achieve the 950 BTU requirement. Under Exxon Mobil's own theory, the jury could have logically concluded that Exxon Mobil would not have been entitled to any more propane as a plant product than what it received.[9] Accordingly, we find that the jury's answer to Question 2 was not against the great weight and preponderance of the evidence. We overrule Exxon Mobil's second issue.

## Conversion

 In its first issue, Exxon Mobil contends that the trial court erred in granting a directed verdict against its conversion claim. A trial court may direct a verdict when either (1) a plaintiff fails to present evidence raising a fact issue essential to its right of recovery, or (2) the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000). In reviewing the grant of a directed verdict, we follow the normal standards for assessing the legal sufficiency of the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 809–828 (Tex.2005).

 In their motion for directed verdict, appellees asserted several grounds, including that Exxon Mobil's conversion claim was barred by the independent injury rule.[10] This rule takes into account the fact that contractual relationships between parties sometimes create duties under both tort and contract law. Under the rule, if the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the

**8.** Regarding propane in the residue gas stream, please see note 12, *infra*.

**9.** In addition to paragraph 10.03, several other sections of the contract support this conclusion. Paragraph 1.14 defined "residue gas" as "that volume of gas remaining after the extraction therefrom of Plant Products and Plant Fuel requirements." Thus, any propane molecules remaining in the residue stream after processing would not constitute "plant product" but would be part of the "residue gas." Paragraphs 2.03, 6.05, 9.02, and 11.01 additionally suggest that Exxon Mobil was entitled only to propane that was extracted as plant products and not varied as necessary for BTU control (whether actually used for BTU control or not). Under paragraph 2.03, appellees committed to "extract, separate and save" plant products from Exxon Mobil's gas and to enact BTU control activities. Paragraph 6.05 required appellees to provide the "extracted Plant Products attributable to [Exxon Mobil's] Gas" to Exxon Mobil at the tailgate of the Bushton Plant.

Paragraph 9.02 required appellees to extract plant products such that the heating value of the residue gas would meet certain minimum requirements. Paragraph 11.01 provides that appellees were to be compensated "for each gallon of recovered plant products."

**10.** Exxon Mobil suggests that the trial court specifically granted the directed verdict solely on the ground that the conversion claim was not supported by legally sufficient evidence. We disagree. To begin with, the court's judgment does not state the basis on which the court granted the directed verdict. Furthermore, the judge's comment during the charge conference that he did not think the evidence supported Exxon Mobil's proposed conversion submission does not necessarily indicate that legal sufficiency was the sole ground on which he based the directed verdict. The judge additionally stated that the issue was governed by the contract, which indicates that he also may have accepted appellees' independent injury rule argument.

plaintiff's claim may sound in both tort and contract, but if the defendant's conduct would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract. *Southwestern Bell Tel. Co. v. De-Lanney*, 809 S.W.2d 493, 494 (Tex.1991). The nature of the claimed injury usually determines whether the breached duty lies in tort or contract. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract. *DeLanney*, 809 S.W.2d at 494–95. Further, when the contract spells out the parties' respective rights about a subject matter, the contract—not common law tort theories—governs any dispute about the subject matter. *See DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 105 (Tex.1999).[11]

With these guidelines in mind, it is important to consider exactly what Exxon Mobil claims as its injury. Each of several possible ways to state Exxon Mobil's claim demonstrates that the claim is based in contract and not tort. As discussed above, under the GPA, appellees agreed to extract liquid and liquefiable hydrocarbons (including propane) from Exxon Mobil's gas (or the percentage of the comingled gas stream attributable to Exxon Mobil). The parties also agreed that the amount of propane to which Exxon Mobil would be entitled would be "varied, as necessary, in order to meet" the minimum BTU requirements, *i.e.*, Exxon Mobil would receive less propane as a plant product to the extent BTUs in the residue stream needed to be enhanced. As also discussed above, under its contract claim, Exxon Mobil asserted that appellees breached the GPA by extracting and keeping the propane and using methane instead of propane to control BTUs in the residue gas stream. In its conversion claim, Exxon Mobil asserts that appellees converted its propane by keeping it instead of giving it to Exxon Mobil as a plant product.[12] Stated another way, Exx-

11. We reject Exxon Mobil's suggestion that the independent injury rule operates only to bar claims asserting negligent performance of a contract. If this were true, it appears likely that the supreme court would have stated so in *DeWitt*, *DeLanney*, or *Reed*. Instead, the court set forth the analytical framework that we discuss and apply in this opinion.

12. It is interesting but not essential to note that at no point has Exxon Mobil suggested that the residue gas stream was unfit for its intended purpose or of an inferior quality because it contained methane instead of propane. Neither in its briefing nor in its oral presentation before this court has Exxon Mobil made any representations regarding the residue stream, except for one undeveloped reference that the BTUs may not have always met the minimum requirement.

Additionally, it would appear that if the amount of propane in the residue gas stream was important to Exxon Mobil, it could have measured this amount, but there is no evidence that it ever did so in ten years of operating under the GPA. Exxon Mobil asserts that in one of its audits, it requested a gas chromatograph at the tailgate of the gas plant, which would have revealed the constituent percentages of the stream, but appellees refused to permit this test. However, Exxon Mobil does not explain why, if the makeup of the stream was important to it, it could not have tested it at another location on the pipeline. Nor do they explain why they asked for this only once in ten years and apparently did not pursue the issue after appellees refused to permit it.

Further, Exxon Mobil offers no explanation as to why the reinsertion of propane into the gas stream would have been important to it apart from BTU control, which was achieved by insertion of a different hydrocarbon. Typically, residue gas streams from natural gas processing plants are then sold as useable natural gas. Exxon Mobil points to no evidence that it would have done anything different with the residue gas stream or would have received any increase in profits had the residue gas stream contained more propane than it did.

on Mobil essentially argues that the manner in which appellees performed their obligations under the contract converted one of the very products that the contract was entered into to produce (or extract). In essence, Exxon Mobil claims that it did not receive all of the propane that it was entitled to under the GPA. Regardless of how they are phrased, Exxon Mobil's contract and conversion claims are simply the same factual claim stated alternatively under contract and tort theories.

While it is true that the commodity that Exxon Mobil contends appellees converted existed prior to the GPA in the sense that the hydrocarbon molecules existed in the gas stream, the propane did not exist as a processed plant product before the existence of the GPA. Indeed, the very point of the GPA was the extraction of such commodities into useable form, *i.e.,* appellees processed the gas stream such that propane and other liquid and liquefiable hydrocarbons were extracted as plant products. If there had been no contract, there would have been no extracted propane in appellees' possession. Two things are clear: (1) the only loss Exxon Mobil complains of is the propane, which is the subject of the contract, *see DeLanney,* 809 S.W.2d at 494–95; and (2) the contract spells out the parties' respective rights regarding the processing of the propane, *see DeWitt County Elec. Co-op.,* 1 S.W.3d at 105.[13]

Certainly, as Exxon Mobil suggests, a legal duty generally exists in tort for one party not to convert the property of another party, which is separate and apart from any contractual relationship between the parties; however, the analysis does not end there and could not end there—otherwise, there would be no independent injury rule. In *DeWitt,* landowners sued a utility company alleging that it negligently cut down trees in its right-of-way. 1 S.W.3d at 99. The court held that even though the landowners could have brought a negligence action if no agreement regarding the right-of-way had existed between the parties, because such an agreement existed, the agreement and not common law tort principles governed the dispute. *Id.* at 105. Similarly, in *Abraxas Petroleum Corp. v. Hornburg,* working interest owners in an oil field sued the production company, alleging, among other things, the common law tort of waste. 20 S.W.3d 741, 747–49 (Tex.App.-El Paso 2000, no pet.). The court held that because the parties had a contract governing the production company's conduct in regard to production of oil from the field, the cause of action was one for breach of contract and not for common law waste. *Id.* at 752–53. In this case, because the rights of the parties in regard to the propane are governed by the agreement between them, Exxon Mobil's claim sounds in contract, not in common law tort.

The very nature of the dispute between the parties was whether appellees legally performed their contractual obligations under the GPA. Appellees have conclusively demonstrated that Exxon Mobil's conversion claims were barred by application of the independent injury rule. Accordingly, the trial court did not err in granting a

---

**13.** It is interesting to note that although Exxon Mobil continually asserts that appellees had no right to any of the propane and that title to the propane always remained with Exxon Mobil, the contract itself specifies that at most, Exxon Mobil could recover 88% of the propane attributable to its natural gas, even if there was no need for BTU control. The remainder, according to at least one Exxon Mobil witness and a logical interpretation of the contract, went to appellees. This further confirms that the rights of the parties to the propane were governed by the GPA.

directed verdict against this claim. Exxon Mobil's first issue is overruled.

### Trial Judge's Conduct

 In its third issue, Exxon Mobil contends that the trial judge commented on the weight of the evidence in front of the jury. The discretion vested in the trial court over the conduct of a trial is great, and the judge has authority to express himself or herself in exercising this broad discretion. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). Texas judges, however, are prohibited from commenting on the weight of the evidence. *In re M.S.,* 115 S.W.3d 534, 538 (Tex.2003). A trial court comments on the weight of the evidence when it indicates an opinion as to the verity or accuracy of the facts in inquiry. *Vickery v. Vickery,* 999 S.W.2d 342, 380 (Tex.1999).

Exxon Mobil specifically argues that the trial judge commented on the weight of the evidence when he: (1) admonished Exxon Mobil's counsel during closing argument; (2) interacted with witnesses while they were being examined by counsel; and (3) discussed the case with the attorneys during a break in the trial. We discuss each argument in turn.

 Exxon Mobil first complains about the following exchange, during Exxon Mobil's closing argument, regarding appellees' swapping of propane for methane:

[COUNSEL]: That document tells you what they were doing with that excess stuff. So they had another contract that they didn't tell us about. They didn't need to. But they didn't put our name on it because this is an illegitimate business deal and they were covering it up. If it were a legitimate deal, all of these exhibits would have been out in open [sic]. The swap agreement. They would have asked our consent and put our name on it and they would have had the swap agreement in that room.

THE COURT: Counsel, confine yourself to the evidence. There is no evidence this was an illegitimate deal. That's unsupported argument.

The record does not demonstrate that Exxon Mobil objected to the trial court's comments. A party waives appellate review when it fails to object to a trial judge's comments and request an instruction to disregard unless the comment could not have been rendered harmless by an instruction. *Francis,* 46 S.W.3d at 241; *see also Capellen v. Capellen,* 888 S.W.2d 539, 547 (Tex.App.-El Paso 1994, writ denied) ("Unless the comment by the judge is so blatantly and obviously prejudicial that it cannot be cured, an objection and request for instruction must be made in order to preserve error.").[14]

It is unclear whether the trial judge was stating that there was no evidence that the swap agreement itself, between two separate but related entities, was illegitimate, or that there was no evidence that the very swap of methane for propane was illegitimate in the context of the GPA between

---

14. In its brief, Exxon Mobil asks, "Is a trial judge who makes comments such as these likely to immediately sustain an objection to them?" With this query, Exxon Mobil appears to be arguing that the trial judge's comments indicate he was so predisposed against it that he could not possibly see the error of his ways, assuming he had erred. However, Exxon Mobil provides no authority to support such an analysis, and we do not assume that a trial judge would not reconsider erroneous conduct given the opportunity. The rule is that to preserve error, an objection must be made to a trial judge's comments and an instruction requested unless the comment could not have been rendered harmless by an instruction. *Francis,* 46 S.W.3d at 241; *Capellen,* 888 S.W.2d at 547.

appellees and Exxon Mobil.[15] It appears more likely that he was referring to the swap agreement between the related entities. Exxon Mobil does not cite to any evidence that this swap agreement standing alone was illegitimate. Accordingly, we cannot say that the judge's comment was so blatantly and obviously prejudicial that an instruction would not have cured it.

■■■■■ Exxon Mobil next complains about the judge's interaction with certain witnesses during trial. Generally, a Texas trial judge should not engage in substantive questioning of witnesses. *Pitt v. Bradford,* 843 S.W.2d 705, 708 (Tex.App.-Corpus Christi 1992, no writ). However, under certain circumstances, a judge may attempt to paraphrase and clarify a witness's answer. *Born v. Va. City Dance Hall & Saloon,* 857 S.W.2d 951, 956–57 (Tex.App.-Houston [14th Dist.] 1993, writ denied). Exxon Mobil specifically points to three instances in which the judge interacted with witnesses.

The first occurred while Exxon Mobil's counsel was questioning an Exxon Mobil auditor:

Q: How do you know the processor didn't need that for our residue stream to meet this requirement at the tailgate of the plant?

A: Well, if he needed it he would have reinjected it, and he didn't. Or else he didn't meet the tariff to begin with.

Q: Okay.

. . . .

THE COURT: Do you have personal knowledge of that or is that something you deduce?

THE WITNESS: Well, either one of [sic] the other happened, either they were able to meet the tariff and not inject it or didn't inject it and didn't meet the tariff. Those are the two options.

THE COURT: Well, what's troubling me is we have heard about propane coming from other sources, and it seems to me that the tariff could have been met from other sources and you just told us this was all calculated.

THE WITNESS: I'm not aware of any propane coming from any other sources and entering before the tailgate of the rich stream.

THE COURT: Other producers, other gas streams, things like that, people would have different contracts that you didn't audit?

THE WITNESS: They may very well have met the tariff that way. But if they met it that way, then they didn't meet ours.

Exxon Mobil again did not object to the trial court's comments. On appeal, it contends that the court's latter two statements were particularly troublesome because they indicated that (1) the court was concerned about the state of Exxon Mobil's evidence and (2) there may have been other methods for the defendants to have complied with the contract. Exxon Mobil, however, provides no explanation as to why meeting the tariff with propane from other sources would not have fulfilled the

---

**15.** Appellees suggest that counsel's reference to an "illegitimate business deal" was intended to remind jurors of the Enron accounting scandals, and as such may have violated the trial court's limine order. In its briefing, Exxon Mobil suggests that the swap agreement was a "mark-to-market" transaction.

Such transactions were, indeed, at the heart of some of the Enron accounting scandals. *E.g.,* Peter T. Muchlinski, *Enron and Beyond: Multinational Corporate Groups and the Internationalization of Governance and Disclosure Regimes,* 37 Conn. L.Rev. 725, 732–33 (2005).

contract. Nor does it explain why fulfilling the contract with propane from others sources would have been damaging or troubling to Exxon Mobil. Accordingly, we cannot say that the court's comments were so blatantly and obviously prejudicial that an instruction would not have cured them.

■ The second witness interaction occurred when Exxon Mobil's counsel was cross-examining a defense witness.

Q: So the only way Mobil would know how you're operating in that plant and what the BTU content is and how much you're getting out of gas and all those things, they are going to have to rely on you for that information, aren't they?

A: The plant operation doesn't matter. This contract is a fixed recovery contract based on what Mobil puts into the system.

[COUNSEL]: May I get an instruction to answer the question, please?

THE COURT: I think there's an implied answer in his question Mr. Kenney [sic]. And question was Mobil is going to have to rely on you to know how you're operating this plant. His answer suggests Mobil doesn't need to know how they are operating the plant, they just need to know whether the contract is being complied with. That's what I hear him saying. So ask another question.

Again Exxon Mobil made no objection. Exxon Mobil contends that the judge's comment suggested that the defendants were not fraudulently concealing information. However, Exxon Mobil offers no explanation for this conclusion. In the absence of such explanation, we are without a basis on which to say that the court's comment was so prejudicial that an instruction would not have cured it.[16]

■ In the third witness interaction, the judge asked a question to a defense witness immediately after the defense finished their questioning of the witness and rested their case.

THE COURT: Mr. Gifford, I have a question. I don't know whether this is really in your area or not.

THE WITNESS: Uh-huh.

THE COURT: The contract provides in paragraph 2.03, says: "The residue gas attributable to Mobil's gas and delivered to the processor, to Mobil's transporter pursuant to the—delivered by processor to Mobil's transport"—

[COUNSEL]: Your Honor, may we have a side-bar at this point?

THE COURT: No. I want to ask a question.

[COUNSEL]: I understand. And I have objection to that, your Honor. If we may have a conference at the bench.

THE COURT: All right.

(Bench conference.)

THE COURT: Was it your job—were you supposed to audit the tailgate of the pipeline to determine whether the monthly average met this 950 BTU tariff?

THE WITNESS: I don't recall ever auditing that number. It's not—I don't know if that was our responsibility or not, but I know we didn't really audit that number. And again, Dave Yarbrough, to me, knew more about the gas than I did and he never had a problem with it.

---

16. Exxon Mobil additionally notes another interaction with another witness but offers no argument as to why that interaction was inappropriate. Not all questioning of witnesses by a trial judge is necessarily improper. *See Born,* 857 S.W.2d at 956–57.

We first consider whether counsel's statement that he had an objection was sufficient to preserve the issue for review. To begin with, it is unclear whether counsel's objection was to the fact that the judge wanted to ask a question or to the substance of the question itself. Given that counsel had not previously objected when the judge asked the questions Exxon Mobil now complains of, it appears more likely that counsel was objecting to the nature of this question. Further, after an off-the-record bench conference, the judge apparently proceeded to ask a different question than the one he had begun to ask before counsel objected. Counsel did not renew his objection. Thus, the logical inference is that counsel did not have an objection to the substance of the judge's second question.

Exxon Mobil insists, however, that the judge's last question served to rehabilitate the witness, who was a disgruntled former employee according to Exxon Mobil. It suggests that because the judge "turned to" this witness for "truthful information about the contract and the audits," he rehabilitated the witness in the eyes of the jury. To the extent the judge's question could potentially have had such an impact, we do not believe that the question "were you supposed to audit the tailgate of the plant" was so prejudicial that it could not have been overcome by an instruction to disregard, particularly in light of the witness's answer, "I don't know."

 Lastly, Exxon Mobil maintains that the trial judge engaged in a tirade against its counsel within the possible hearing of the jury.[17] In support of this claim, Exxon Mobil cites to the testimony of one of its own paralegals who testified that while the judge was speaking over the microphone: (1) he (the paralegal) saw that the jury room door opened and closed approximately three times, (2) he saw one juror standing at the door at one point, and (3) he saw another juror walk through the back of the courtroom. He admitted, however, that he did not know if any of the jurors heard any of the judge's comments. Thus, there is no persuasive evidence that any of the jurors heard the judge's allegedly improper comments. In the absence of evidence establishing that any of the jurors heard the judge's comments, we decline to hold that the possible effect of the comments merits a new trial.[18] Based on the foregoing reasons, we overrule Exxon Mobil's third issue.

The trial court's judgment is affirmed.

---

17. Exxon Mobil may have preserved this issue by moving for a mistrial, which the trial judge denied. The judge sua sponte instructed jurors to disregard any of his comments that they may have overheard.

18. Exxon Mobil suggests that Rule 327(b) of the Texas Rules of Civil Procedure and Rule 606(b) of the Texas Rules of Evidence would have prevented any of the jurors from testifying regarding what he or she may have heard. Tex.R. Civ. P. 327(b); Tex.R. Evid. 606(b). We disagree. Rules 327(b) and 606(b) apply only to post-verdict juror testimony and prohibit only testimony regarding any matter or statement occurring during deliberations or regarding the effect of anything upon a juror's mind or emotions in connection with deliberations. *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 370, 375 (Tex.2000). If a problem develops during trial, the court may question the jury by voir dire and take corrective measures such as instructing the jury, dismissing particular jurors, or declaring a mistrial. *Id.* at 375. Nothing in the rules would prohibit a juror from testifying that he or she had heard the judge's comments, which came about halfway through the trial and not during deliberations. *See* Tex.R. Civ. P. 327(b); Tex.R. Evid. 606(b); *Golden Eagle Archery*, 24 S.W.3d at 370; *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 448 (Tex.App.-Houston [14th Dist.] 2002, no pet.).