# IN THE COURT OF APPEALS OF IOWA

No. 15-1120
Filed September 28, 2016

**STEVEN SHEEDER,**
Plaintiff-Appellee/Cross-Appellant,

**vs.**

**JAMES JAMISON, Individually, and d/b/a Jamison & Sons, a/k/a J&S Ag Services,**
Defendant-Appellant/Cross-Appellee.

_____

Appeal from the Iowa District Court for Dallas County, Gregory A. Hulse, Judge.

Both parties appeal following the district court's decision adjudicating a custom farming contract dispute. **AFFIRMED.**

John P. Roehrick of Roehrick Law Firm, P.C., Des Moines, for appellant/cross-appellee.

Steven P. Wandro, Kara M. Simons, and Brian J. Lalor of Wandro & Associates, P.C., Des Moines, for appellee/cross-appellant.

Heard by Vogel, P.J., and Vaitheswaran and McDonald, JJ.

**VOGEL, Presiding Judge.**

James Jamison appeals, and Steven Sheeder cross-appeals, the district court's decision adjudicating the parties' dispute over a custom farming agreement. Jamison asserts there is a lack of substantial evidence to support the district court's decision that he converted grain-sale proceeds by overcharging for services and products under the custom farming agreement. He also asserts the court erred in awarding punitive damages because he claims his breach of the parties' contract did not rise to the level of an intentional tort. Sheeder contends the court correctly discerned Jamison converted the proceeds from the grain sales and correctly awarded punitive damages in light of Jamison's conduct. However, Sheeder cross-appeals the district court's decision, claiming the court erred in failing to find Jamison stole grain from Sheeder's 2011 harvest. For the reasons stated below, we affirm the district court's decision.

## I. Background Facts and Proceedings.

In the winter of 2010-2011, Sheeder discovered that while he had rented over 1500 acres of farm land for the 2011 growing season and paid most of the rent in advance, he was without the financing needed to secure the seed and other inputs necessary for a crop. Sheeder was introduced to Marvin Mitchell, an employee of Jamison.[1] Thereafter, Mitchell, Jamison, and Sheeder worked out a custom farming agreement whereby Jamison would provide the seed, other inputs, and labor through Mitchell to plant and harvest the crop. In return,

---

[1] In addition to performing custom farming, Jamison was also a seed salesman for various companies and had a trucking business.

Jamison would have a lien on the crop harvest in the amount of the services provided under the agreement during the growing season. The contract, initially signed on March 31, 2011, and later amended, was drafted by Jamison's employee, Mitchell. Mitchell also negotiated a line of credit with Agriland FS for the operating funds for anhydrous ammonia, chemicals, and spraying. Jamison was required by Agriland FS to personally guarantee the line of credit for Sheeder, and in light of his guarantee, Jamison demanded that the only people who could make purchases on the line of credit included himself or his agent.

Mitchell and Jamison performed the planting of the various tracts of land Sheeder had rented, and by all accounts prior to harvest, the crop looked good. Mitchell also prepared invoices for Sheeder for the work done during the planting season, though these invoices would await payment from the proceeds of the harvest.

The relationship between the parties soured during harvest. Sheeder believed the yields Jamison was reporting were too low, leading Sheeder to believe Jamison was stealing grain from the harvest. The harvest was recorded on digital devices in the harvesting equipment, and the district court noted the parties agreed the record of the harvest from the equipment roughly equaled the amount of grain sold in Sheeder's name at the grain elevators. However, Jamison admitted the digital devices could be turned off or otherwise manipulated. Sheeder also testified Jamison loaded some of the harvested grain into a bin against Sheeder's wishes. Sheeder placed locks on the grain bin to ensure the grain was not removed without his consent. Those locks were repeatedly cut, and the grain removed without Sheeder's knowledge or consent.

Sheeder asked Jamison to leave "test strips" of grain if the yield on the field seemed low so that an insurance agent could ascertain the average yield after which claims could be submitted. Jamison failed to leave any test strips. Jamison also commingled grain while harvesting from various fields, but the district noted the digital records indicated how much grain was removed from each field.

During the settling up of the account after harvest, it was discovered Agriland FS had intermingled Jamison's various accounts. Jamison and Mitchell met with Agriland FS to review the accounts and adjustments were made. However, there remained a $16,296.79 fuel charge to Sheeder that could not be explained, and Mitchell had improperly directed Agriland FS to credit $4000 of Sheeder's harvest money toward Mitchell's personal account at Agriland FS.

Checks for the harvest were mailed to Sheeder from the grain elevators as multiparty checks. Sheeder would endorse the check and then deliver the check to Jamison. Jamison kept what he thought he was owed based on the invoices prepared. Unhappy with the profit from the 2011 harvest, Sheeder filed suit against Jamison and others alleging a number of causes of action. By the time the matter went to trial, only Jamison remained as a defendant, and Sheeder had confined his causes of action to conversion and breach of contract.

After hearing testimony over the course of five days, the district court filed its decision April 15, 2015. The court concluded Sheeder had failed to prove Jamison had converted grain, but it did find Jamison improperly billed Sheeder under the contract resulting in both a breach of contract and the conversion of grain proceeds. Based on these findings, the court awarded Sheeder

$56,263.62. Sheeder was also awarded $70,000 in punitive damages against Jamison because of Jamison's egregious conduct.

Both parties appeal.

## II. Scope and Standard of Review.

A claim for the conversion of property is an action at law and is thus reviewable for correction of errors at law. *Lewis v. Jaeger*, 818 N.W.2d 165, 175–76 (Iowa 2012). Pursuant to this standard, the district court's factual findings have the force of a special verdict and are binding on appeal if supported by substantial evidence. *Van Sloun v. Agans Bros. Inc.*, 778 N.W.2d 174, 179 (Iowa 2010). However, the district court's legal conclusions are not binding on us. *Id.*

A district court's decision to award punitive damages is likewise reviewed for errors at law. *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005). "Punitive damages are only appropriate when a tort is committed with 'either actual or legal malice.'" *Id.* (citation omitted).

## III. Conversion—Grain-Sale Proceeds.

In his first claim on appeal, Jamison contends the improper billing that occurred, if it occurred at all, does not amount to a master plan to deprive Sheeder of the proceeds of the grain sale and thus does not amount to an intentional tort. Jamison contends the overbilling occurred over the course of several months as the invoices were prepared, only six of the twenty-five services billed were invoiced improperly, and the amount of the improper billing was minor when viewed from the perspective of the entire contract, which consisted of over $450,000 worth of products provided and services performed.

Jamison also contends conversion cannot occur in this case because both he and Sheeder had a right of possession to the grain proceeds as Jamison had a first lien on all of the crop proceeds. While conceding there may have been a breach of the contract, Jamison maintains that his actions did not amount to conversion because the invoices were not prepared with a wanton disregard for Sheeder's rights.

"Conversion is 'the wrongful control or dominion over another's property contrary to that person's possessory right to the property.'" *Blackford v. Prairie Meadows Racetrack & Casino, Inc.*, 778 N.W.2d 184, 188 (Iowa 2010) (citations omitted). In order to prove conversion, a party "must establish a possessory interest in the property." *Id.* "[M]oney can be the subject of conversion if the specific money in question can be identified." *Allen v. Gordon*, 429 So. 2d 369, 371 (Fla. Dist. Ct. App. 1983). There is no dispute as to Sheeder's rights to the grain proceeds as the person who rented the land for the 2011 growing season. However, Jamison contends he likewise had a possessory interest in the property by virtue of his lien under the parties' contract. We agree Jamison had a possessory interest in the proceeds but only to the extent of the value of the services and products provided pursuant to the contract.

> Conversion may be predicated upon any distinct act of dominion over another's personal property in denial of his right or inconsistent with it. It may be proved by showing (1) a tortious undertaking, or (2) any use or appropriation to the use of the person in possession indicating a claim of right in opposition to the rights of the real owner, or (3) by a refusal to surrender on demand. Even if the defendant in such proceeding came into possession of the property lawfully, yet if he afterward assumes the control of it as owner, asserting rights therein inconsistent with the rights of the owner, there is a conversion.

*Lee v. Coon Rapids Nat'l Bank*, 144 N.W. 630, 633 (Iowa 1913) (citations omitted).

The checks for the grain proceeds were multiparty checks. Sheeder endorsed the checks and turned them over to Jamison for payment of Jamison's lien under the contract. The conversion occurred in this case when Jamison retained more money from those checks than he was entitled to take under the parties' contract. While he was lawfully in possession of the grain proceeds, Jamison committed conversion when he failed to surrender to Sheeder the amount Sheeder was entitled to receive from those proceeds. By invoicing Sheeder for services above the agreed-upon rate in the contract and then retaining the money from the checks to satisfy the inflated invoices, Jamison unlawfully converted the grain proceeds to his own purposes, which was inconsistent with the rights of the lawful owner, Sheeder.

The court found ten services for which Sheeder was improperly charged, totaling $56,236.62 that Jamison kept from the grain proceeds that he was not entitled to keep. It is not an excuse to the tort of conversion to assert that the amount improperly withheld was small in comparison to the total amount that was properly acquired. *Mau v. Rice Bros.*, 249 N.W. 206, 208 (Iowa 1933) ("The fact that the defendant's profit from the transaction was small is immaterial, because it is not necessary that profit flow to the party guilty of the conversion to create liability for the conversion.").

Jamison contends it was improper to assess to him the amount Sheeder was overcharged by Agriland FS because Jamison was not a party to the contract between Sheeder and Agriland FS, only a guarantor. As the district

court found, before becoming the guarantor Jamison made sure only he or his agent could make charges on the account. Jamison maintained several accounts at Agriland FS and met with Agriland FS to allocate charges to the various accounts when the accounts became intermingled. During this process, Mitchell directed, and Jamison approved, Agriland FS allocating $16,296.79 worth of fuel charges to Sheeder's account, which was ultimately added to Sheeder's bill and withheld from Sheeder from the grain proceeds. The court noted the custom farming agreement rates had the fuel cost already built in. Thus, Jamison, by virtue of his position as guarantor and as the only person who could incur charges on Sheeder's account, assessed Sheeder fuel costs that were not proper under the contract. For that reason, it was appropriate to include the Agriland FS fuel charge in the amount Jamison converted. Any issue Jamison raised on appeal that the language of the contract is ambiguous as to the specific charges invoiced should be resolved Sheeder's favor because it was Jamison, through his agent Mitchell, who drafted the contract. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862–63 (Iowa 1991) ("When a contract is not ambiguous, it will be enforced as written, but when there are ambiguities in a contract, they are strictly construed against the drafter." (citation omitted)).

Ultimately, we find substantial evidence supports the district court's conclusion:

> [W]hen Jamison withheld the above amounts from the 2011 harvest proceeds, he wrongfully exercised control over Sheeder's property and wholly interfered with Sheeder's ability to use the same. The record does not support that Jamison (or Mitchell, as his employee) had a good faith basis to charge fees for consulting, fuel, or a

$4000 credit to Mitchell farms account at Agriland, or to overcharge for scouting, mowing, hauling, grain vacuum, or grain auger fees. These overcharges and unauthorized charges were egregious in light of the parties' express agreement.

## IV.  Punitive Damages.

Next, Jamison contends the court should not have awarded punitive damages in this case.  He asserts the evidence in this case does not show a willful and wanton disregard for Sheeder's rights but simply a dispute over the legitimate charges for the services provided under the contract.  He claims the evidence does not show a persistent course of conduct amounting to a conscious indifference to the consequences.

Punitive damages are meant to "punish bad behavior and deter future bad conduct."  *Miranda v. Said*, 836 N.W.2d 8, 34 (Iowa 2013).  To justify an award of punitive damages, a party must prove "by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another."  *Id.* (quoting Iowa Code § 668A.1(1)(a) (2013)).

> Generally, a breach of contract, even if intentional, is insufficient to support an award of punitive damages.  We will only uphold an award of punitive damages for breach of contract when the breach (1) constitutes an intentional tort, and (2) is committed maliciously, in a manner that meets the standards of Iowa Code section 668A.1.

*Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 347 (Iowa 1999).  In addition, some form of malice, actual or legal, must be shown to support an award of punitive damages.  *Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 743 N.W.2d 525, 529 (Iowa 2007).  "Actual malice may be shown by such things as personal spite, hatred, or ill-will and legal malice may be shown by wrongful

conduct committed with a willful or reckless disregard for the rights of another." *Id.* (citations omitted).

The district court concluded the evidence was insufficient to prove actual malice between Jamison and Sheeder but sufficient to show legal malice. The court concluded Jamison and Mitchell "intentionally and systematically took advantage of Sheeder[] and deprived [him] of [his] property, causing great harm to Sheeder['s] ability to fulfill [his] financial commitments."

> They blatantly charged whatever amounts they felt like despite the parties' unequivocal and express agreements on rates. The likelihood of this harm was entirely foreseeable to Jamison. The evidence shows that Mitchell repeatedly and intentionally charged Sheeder[] fees at rates above those agreed to in the contract and also allocated charges to Sheeder[] that were not authorized under the contract. Mitchell lied about the principal and interest owing to Agriland, which demonstrates an intent to deceive Sheeder[]. Mitchell even admitted some of his actions were wrong. Jamison and his employee, Mitchell, were indifferent to the fact they caused [Sheeder] great harm by converting his harvest proceeds. The Court finds by a preponderance of clear, convincing and satisfactory evidence that Jamison and Mitchell, as his employee, acted with willful and wanton disregard for Sheeder['s] rights and caused actual damage to Sheeder[]. Jamison, individually and as employer of Mitchell, is liable for punitive damages based on his conduct in breaching the custom farm agreement and converting proceeds from the sale of Sheeder['s] crops to his own use.

Jamison contends it was improper for the court to rely on the $4000 Mitchell directed Agriland FS to credit to Mitchell's personal account as a basis for the punitive damage award. The district court had earlier determined that Mitchell's action in this regard was not authorized by Jamison and was outside the scope of Mitchell's authority. We note the district court, in determining whether punitive damages should be award specifically stated, "Even without considering the $4000 that Mitchell converted to his own use, Jamison and

Mitchell as his employee intentionally and systematically took advantage of Sheeder[] . . . ." While the court later referred to Mitchell's lies to Sheeder "about the principal and interest owing to Agriland" and this could be considered a reference to this same $4000,[2] it also could be a reference to the $16,296.79 fuel charge that Mitchell told Agriland FS to assess to Sheeder when such fuel charges were already built in to the rates charged under the contract.

We conclude the court's award of punitive damages in this case is supported by substantial evidence.

**V. Conversion—Grain.**

In his cross-appeal, Sheeder asserts the district court erred in finding a lack of proof to support his claim that Jamison stole grain during the 2011 harvest, amounting to either a conversion of the grain or a breach of the custom farming agreement. Sheeder points to his expert's testimony that the crop land should have yielded at least county averages. If county averages are used, Sheeder contends Jamison stole approximately $282,000 worth of grain. Sheeder claims that while he did not have information about the nutrients and fertilizer used on the land to support his assertion that the ground should have at least yielded county averages, this information was outside his control or knowledge because he relied on Jamison to use whatever products were necessary to support the crop. Any failure of proof Sheeder claims was the result of Jamison failing to provide him the scale tickets segregated by field and Jamison's failure to leave test strips when it became apparent during harvest that

---

[2] Mitchell had disguised this $4000 credit to his account by informing both Jamison and Sheeder it was part of the interest owed to Agriland FS on the line of credit.

the yield was low compared to what was expected. He also points to Jamison's admission that the digital devices meant to monitor the harvest could be manipulated and Jamison's harvest of some of the fields at unusual times when Sheeder's representatives were not present.

The district court extensively and exhaustively analyzed the evidence submitted with respect to the harvest, matching records generated both at the field and at the grain elevator and considering the parties' testimony as to the process and timing of the harvest. The court noted to get the yields up to county averages on three of the farms in Cass County would have taken an additional twenty-three truck loads, which would have required two additional ten-hour days or at least more than three hours each day over the seven-day harvest period. The district court concluded:

> It is highly unlikely that such a scenario could have taken place without some record of corn being delivered somewhere or someone observing the trucks coming and going at all hours. No evidence was produced except the assumptions, and those are insufficient on which to make a finding of stolen grain from Cass County.

With respect to the other fields, Sheeder alleged Jamison stole grain from a grain bin because the locks Sheeder placed on the bin were cut and the grain removed without his knowledge or consent. In considering this claim, the district court noted to conclude the grain inside the bin, which held 35,000 to 40,000 bushels, was stolen would have meant the farm ground yield between 161 and 184 bushels per acre, which was much higher than even Sheeder's expert contended it should have yielded based on county averages—126 bushels per acre. The evidence showed that no less than five people were watching the

harvest at various points in time for Sheeder, but for reasons unexplained none of the written records from these observers were admitted at trial.

Ultimately, in rejecting Sheeder's claim, the court stated:

> When southern Iowa, particularly the Corydon farm is considered, the claim is that 70,000 to 80,000 bushels were converted, taken from the bin, because [Sheeder] had put on three padlocks and they were all "cut off" and the bin emptied.
>
> First, the Court finds it incredulous to believe that if Jamison were to convert 70,000 to 80,000 bushels, he would have taken the time to fill and empty a bin three times. Why not simply have his trucks carry the grain away to wherever he was going to hide it? Further hauling of 70,000 to 80,000 bushels would have required over 60 truckloads. That would have meant that the two trucks of Jamison would have hauled no less than 30 loads each. That would have required, per the testimony of both Sheeder and Jamison, almost five days of harvest (assuming 15,000 bushels a day) to transport away 60 truckloads. The loss of 70,000-80,000 bushels falls within the realm of speculation and conjecture. Again, the absence of records which purportedly were kept by Sheeder's "watchers" militates against the credibility of such a loss.
>
> Finally, to use county averages without any historical records of production and no information as to nutrients and fertilizer and the application or lack thereof does not permit an inference of county-wide averages for each farm, particularly taking into account the lack of evidence by Sheeder as to the yields from each farm.

We conclude substantial evidence supports the court's conclusion that to award Sheeder damages for grain he believed Jamison stole during the harvest would amount to "speculation and conjecture." We therefore affirm the district court's denial of Sheeder's claim that Jamison stole grain during the 2011 harvest.

## VI. Conclusion.

The district court thoroughly analyzed the evidence and claims made by each of the parties in its forty-nine-page ruling. We conclude substantial

evidence supports each of the court's factual findings and no error at law occurred. The district court's decision is affirmed.

**AFFIRMED.**

Vaitheswaran, J., concurs; McDonald, J., dissents.

**MCDONALD, Judge. (dissenting)**

I concur in the majority's resolution of Sheeder's cross appeal regarding the conversion of grain, but I respectfully dissent from the majority's resolution of Jamison's appeal regarding the conversion of grain proceeds and assessment of punitive damages.

"Conversion is the wrongful control or dominion over another's property contrary to that person's possessory right to the property. In order to establish a conversion claim, the plaintiff must establish a possessory interest in the property." *Blackford v. Prairie Meadows Racetrack & Casino, Inc.*, 778 N.W.2d 184, 188 (Iowa 2010) (citations omitted). Although the issue is never directly addressed, our recent cases implicitly conclude money can be property subject to conversion. *See, e.g.*, *id.* at 188 (analyzing claim for conversion of gaming winnings); *Condon Auto Sales & Service, Inc. v. Crick*, 604 N.W.2d 587, 594 (Iowa 1999) (affirming award for conversion of money held in contravention to the plaintiff's possessory interest in the same); *Whitfield & Eddy, P.L.C. v. Mitchell*, No. 04-1721, 2005 WL 3115769, at *4 (Iowa Ct. App. Nov. 23, 2005) (reversing grant of motion to dismiss where farmer pleaded conversion of grain proceeds). To the extent money can be subject to conversion, the claim is cognizable only where the money at issue is a specific chattel, specifically identifiable, or segregated. *See Lee v. Coon Rapids Nat'l Bank*, 144 N.W. 630, 634 (Iowa 1913) (stating there can be no conversion of money without "distinguishing earmarks"); *see also In re Thebus*, 483 N.E.2d 1258, 1260–61 (Ill. 1985) (holding failure to remit funds owed was not conversion because the funds were not in a separate, identifiable fund); *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 966 (Md. 1999) ("The

general rule is that monies are intangible and, therefore, not subject to a claim for conversion. An exception exists, however, when a plaintiff can allege that the defendant converted specific segregated or identifiable funds." (citations omitted)); 18 Am. Jur. 2d *Conversion* § 7 ("[M]oney can be the subject of conversion but only when it is in the form of specific chattel, such as old coins, or when the money is delivered to another party for safekeeping, the keeper claims no title, and the money is required and intended to be segregated, either substantially in the form in which it was received or as an intact fund.")

Even when viewing the record in the light most favorable to the district court, the money at issue was not a specific chattel, specifically identifiable, or segregated into a separate account. Sheeder failed to present any evidence establishing the grain proceeds were specifically identifiable or placed into a segregated account. To the extent the flow of funds can be determined from this record, the evidence shows the proceeds were deposited into and transferred among several general accounts and commingled with other funds. For example, Poet Energy's payment for the grain was a multi-party check made payable to Sheeder, Jamison, Agriland, and John Wepler. The Poet check was deposited by Agriland into its general account and payment was applied to Sheeder's line of credit. Agriland paid the balance of the proceeds from its general account to Jamison. Jamison made payment to Sheeder from Jamison's personal account. Cargill paid for grain after delivery in twenty separate checks mailed to Sheeder, most of which were made payable to Sheeder and Jamison. Sheeder presented the checks to Jamison, and Jamison deposited the checks into his personal checking account or made the checks payable to Agriland. The

record is not exactly clear, but either Jamison wrote a check to Sheeder out of his personal checking account for payment pursuant to the parties' contact or Agriland made a check payable to Sheeder and adjusted Jamison's account with Agriland. What is clear is Sheeder failed to prove the money was specifically identifiable or held in a segregated account.

Sheeder's failure to prove the funds at issue were a specific chattel, specifically identifiable, or held in a segregated account defeats his conversion claim. *See Delmore v. Gonzales*, 903 So.2d 140, 145 (Ala. Civ. App. 2004) (affirming dismissal of conversion claim where funds were commingled); *Warm Springs Props., Inc. v. Andora Villa, Inc.*, 526 P.2d 1106, 1108 (Idaho 1974) (holding party was "foreclosed from maintaining this action on the theory of conversion because once the funds were received . . . they went into [a] general checking account and lost any specific identity"); *Allied Inv. Corp.*, 731 A.2d at 967 ("[I]f a defendant maintains possession of the proceeds in question, but commingles it with other monies, the cash loses its specific identity."); *John B. Parsons Home, LLC v. John B. Parsons Found.*, 90 A.3d 534, 547 (Md. Ct. Spec. App. 2014) (affirming dismissal of conversion action where funds were commingled in general account); *Moore Equip. Co. v. Callen Constr. Co., Inc.*, 299 S.W.3d 678, 681 (Mo. Ct. App. 2009) ("[I]n general, an action for conversion does not lie for the wrongful taking of money. The reason behind this rule is that an ordinary debt or money cannot be described or identified as specific chattel." (citations omitted)); *Auguston v. Spry*, 723 N.Y.S.2d 103, 106 (N.Y. App. Div. 2001) ("As commingled money, his money was incapable of being converted."); *Austin v. Indep. Life & Acc. Ins. Co.*, 370 S.E.2d 918, 921 (S.C. Ct. App. 1988)

(holding claim would not lie where money was deposited into general account and commingled with other funds).

Jamison argues that Sheeder's claim sounds in contract and not tort. I agree. As a general rule, an action for conversion should not lie where the dispute arises solely out of contractual obligations. *See, e.g.*, *The Cuneo Law Group, P.C. v. Joseph*, 669 F. Supp. 2d 99, 123 (D.D.C. 2009) ("However, a claim for conversion of money may not be maintained to enforce a contractual obligation for payment of money."); *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp. 2d 807, 826–27 (E.D. Ky. 2013) (stating a conversion action could be maintained for the recovery of money physically taken from a person's possession, but a conversion claim could not be brought where the property right alleged to have been converted arose entirely from contractual rights); *Wang Labs., Inc. v. Burts*, 612 F. Supp. 441, 446 (D. Md. 1984) ("As a general rule . . . failure to pay a contractual debt is not the equivalent of conversion."); *Sullivan v. Thorndike*, 934 A.2d 827, 836 (Conn. App. Ct. 2007) ("A mere obligation to pay money may not be enforced by a conversion action . . . and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied."); *Spanish Broad. Sys., Inc. v. Alfonso*, 689 So.2d 1092, 1094–95 (Fla. Dist. Ct. App. 1997) ("[The] mere obligation to pay money may not be enforced by a conversion action. An action in tort is inappropriate where the basis of the suit is contract, either express or implied."); *Van Sickle v. Hallmark & Assocs., Inc.*, 744 N.W.2d 532, 539–40 (N.D. 2008) (affirming dismissal of conversion claims arising over retention of oil proceeds on the ground the claim originated in contract); *Welty v. Martinaire of Oklahoma,*

*Inc.*, 867 P.2d 1273, 1275 (Okla. 1994) ("If Martinaire did not pay Welty all she had coming when it was due, then a debt came into existence under the contract. One may not maintain a tort action in conversion to satisfy a debt. This is not a conversion case." (citations omitted)); *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 584 (Pa. Super. Ct. 2003) (applying gist-of-the-action doctrine and disallowing a party "to interject a claim for tortious conversion into an action that is decidedly contractual"); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) ("When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone."); *Exxon Mobil Corp. v. Kinder Morgan Operating L.P. "A"*, 192 S.W.3d 120, 126–27 (Tex. App. 2006) (stating under the independent injury rule "if the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may sound in both tort and contract, but if the defendant's conduct would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract"). Here, Sheeder admits his conversion claim is congruent with his contract claim. In other words, he cannot prove conversion without first proving breach of contract. This concession is reflected in the district court's findings; the district court found the acts constituting a breach of contract were the same acts constituting conversion. There is no reason to blur the line between contract and tort and allow a party to sue in tort when the duty to pay arises solely in contract.

For the foregoing reasons, I would affirm the judgment of the district court with respect to Sheeder's claim for breach of contract, I would affirm the judgment of the district court with respect to Sheeder's claim for conversion of

grain, and I would reverse the judgment of the district court with respect to Sheeder's claim for conversion of grain proceeds. Because I conclude that the conversion claim fails as a matter of law, I would also reverse the award of punitive damages.