**Affirmed as Modified and Memorandum Opinion filed November 6, 2014.**



In The

# 𝕱𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝕮𝔬𝔲𝔯𝔱 𝔬𝔣 𝕬𝔭𝔭𝔢𝔞𝔩𝔰

## NO. 14-13-00730-CV

### HUA XU, Appellant

### V.

### DAVID K. LAM A/K/A KA PUN LAM A/K/A KA P. LAM A/K/A DAVID LAM A/K/A KAPUN LAM AND JIA TIAN A/K/A ANGELA TIAN, Appellees

**On Appeal from the 189th District Court
Harris County, Texas
Trial Court Cause No. 2010-79571**

## MEMORANDUM OPINION

This is a dispute between a real estate investor and the two agents who managed her properties. Hua Xu (the "Investor") sued David K. Lam and Jia Tian (collectively, the "Agents"), seeking damages for breach of contract, fraud, and breach of a fiduciary duty. After a trial by jury, the Agents moved for a directed verdict, which the trial court granted on the basis of limitations.

On appeal, the Investor raises three issues challenging whether the statute of limitations barred her suit. In a fourth issue, the Investor disputes whether the Agents were properly awarded attorney's fees. We overrule the Investor's first three issues and affirm the trial court's take-nothing judgment. We sustain the Investor's fourth issue, however, because the Agents did not establish any basis for their award of attorney's fees. We modify the trial court's judgment to delete the award of attorney's fees and affirm the judgment as modified.

## BACKGROUND

In 2003, the Investor purchased several rental properties in her hometown of Tucson, Arizona. Thanks to a very strong local market, the properties more than doubled in value in a short span of two years. The Investor decided to sell her properties while prices were high, then looked to reinvest her gains in additional real estate.

While shopping for new properties, the Investor came across an advertisement in a Chinese-language newspaper, which had been promoting the real estate market in Houston, Texas. The advertisement had been written by the Agents, who were in search of new investors. The advertisement indicated that the Agents knew of several condos in the Houston area, which could easily provide an investor with a dependable source of rental income. The advertisement also represented that the Agents could manage these properties on behalf of an investor and achieve a 100% occupancy rate and a high return on investment of at least 20%.

The Investor contacted the Agents by phone to discuss a possible investment. Intrigued by her prospects, the Investor flew to Houston and arranged to meet the Agents in person. Upon her arrival, the Agents requested that the Investor sign a brokerage agreement before they showed her any properties. The

parties used a standard form prepared by the Texas Association of Realtors to execute their contract. In the agreement, the Investor granted to the Agents the exclusive right to represent her in all property acquisitions in Houston. The agreement operated for a period of one year, commencing on November 2, 2005, and ending on November 2, 2006.

On the final page of the brokerage agreement, the parties added a special, handwritten clause pertaining to commissions. The clause stated as follows: "Buyer pays $1,000.00 for acquisition of each condo recommended by Broker. SFR[1] & Multi-Residential Unit commission charge on a case by case basis."

Within five months of signing the brokerage agreement, the Investor purchased twenty condos and two single-family residences. After closing on each property, the Investor entered into a management contract with the Agents, which authorized them to negotiate and execute leases on the Investor's behalf.[2] The management contract also gave the Agents the power to collect rents and perform other duties as a typical landlord. The Agents bargained for a monthly management fee in exchange for these services, which continued indefinitely until either party submitted written notice of termination.

The Investor anticipated that the Agents would use their special contacts with the local division of Section 8 Housing to quickly fill her properties with tenants. Foreseeing that her tenants would also be government-sponsored, the

---

[1] Single-Family Residence.

[2] The record contains a copy of only one of the management contracts, which, like the brokerage agreement, is just a standard form prepared by the Texas Association of Realtors. The terms of the missing management contracts are not material to this case because the parties' contract arguments focus exclusively on the brokerage agreement. For purposes of this appeal, we will assume that the same contract form was used for each of the Investor's properties, which is consistent with the parties' testimony at trial.

Investor believed that her properties would generate a steady stream of income, with a low risk of default.

The properties did not perform as expected, however. All of the properties required repairs, which added to the Investor's expenses and reduced her bottom line. Ten condos allegedly produced no income at all, despite assurances by the Agents that they had been fully leased. Of the remaining twelve properties, only four generated rents at an acceptable rate of return.

The Investor faced a serious cash flow problem in the Spring of 2006, which forced her to liquidate a large portion of her assets. Between May and October of that year, the Investor sold eight of her condos, each at a net loss.[3] As she continued to lose money to taxes and other costs, the Investor elected to terminate her management contracts with the Agents. The termination notices were submitted over a two-week period at the end of January 2007.

The Investor filed this action on December 7, 2010, asserting causes of action for breach of contract, fraud, and breach of a fiduciary duty.[4] The Agents counterclaimed for defamation and declaratory relief. The Agents also asserted the statute of limitations as an affirmative defense.

The Investor's contract claim focused on an oral promise that had allegedly been made when the parties executed their brokerage agreement. The alleged promise contained virtually the same terms as the Agents' newspaper advertisement. According to the Investor, the Agents promised that if she ever

---

[3] There is conflicting evidence regarding the number of resold properties. The Investor testified that she had sold nine properties by the end of October 2006, but her records reflect only eight conveyances. In the end, this discrepancy has no effect on the disposition of this appeal.

[4] Separate causes of action were also asserted for conversion, exemplary damages, and theft under the Texas Theft Liability Act, but the Investor has not appealed the trial court's take-nothing judgment as to these claims, and we do not address them.

4

purchased a property, then they would have it leased within two weeks of closing, and the return on investment would meet or exceed 20%.

The rate of return supposedly contained two components, and the first component referred to the Investor's expected annual rental income. For each property purchased, the Agents allegedly promised that the Investor would recover at least 20% of her sales price in a year's worth of rent.[5] The second component related to the property's value. According to the Investor, the Agents promised that she could buy properties that were 20% below market value, meaning she would realize a huge profit if she decided to resell.

The Investor testified that the Agents made these promises in exchange for a $1,000 commission made payable upon the acquisition of any property. The Investor acknowledged that the terms of these promises had not been reduced to writing. Nevertheless, the Investor claimed that the promises had been negotiated in the parties' brokerage agreement. The Investor essentially argued that the handwritten clause at the end of the brokerage agreement represented both a commission provision and a guaranty.

The Investor's fraud claim largely mirrored her claim for breach of contract. She alleged that the Agents had wrongly induced her into signing the brokerage agreement by promising that she would see a 20% return on her investment not long after she purchased her properties.

As for her final claim, the Investor alleged that the Agents had breached a fiduciary duty when they stole or converted funds that belonged to her. The

---

[5] Excluding repairs and other expenses, the Investor's total cost basis in the twenty-two properties was less than $480,000, with an average sales price per property of approximately $21,760. So, assuming there were an enforceable promise, the Investor would expect, per property, an average return of $4,352 each year ($21,760 × 0.20), or rents of $362.67 per month ($4,352 / 12).

evidence at trial focused on a check from a local housing authority, which had been written in August 2006. Although the Investor was designated as the payee, the check had actually been delivered to the Agents in their capacity as property managers. According to the Investor, the Agents forged her name to the back of the check and cashed it for themselves. The Agents denied any forgery, claiming instead that the Investor's husband was the person who had endorsed the check. The Agents further asserted that they cashed the check and delivered the money to the Investor's husband, who was in Houston making repairs on some of the properties.

The Agents moved for a directed verdict as soon as the Investor rested her case. The motion was based on several theories, including the parol evidence rule, lack of evidence, and the statute of limitations. The trial court focused exclusively on the affirmative defense of limitations. In its final judgment, the court ruled that the Investor should take nothing on her causes of action because each of them was barred by the statute of limitations.

The Agents consented to entry of judgment without having put on any evidence of their counterclaims. They effectively abandoned their own claims for relief. Despite having received no affirmative damages, the court awarded the Agents $50,000 in attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code. The Investor challenged this award and the directed verdict in a motion for JNOV, but the trial court never ruled on the motion. A motion for new trial was also filed, but it was corrupted during the electronic filing process, and has not been included in our record.

## ISSUES PRESENTED

In her first three issues, the Investor challenges the application of the statute of limitations. In her fourth issue, the Investor challenges whether the Agents are deserving of attorney's fees.

Appearing pro se on appeal, the Agents respond that the trial court correctly determined that the Investor's suit was time-barred. By cross-point, they argue that the trial court's directed verdict can be supported by additional theories even if the statute of limitations does not apply. The Agents further assert the following ancillary arguments: (1) this court lacks appellate jurisdiction, (2) the appeal should be dismissed because of procedural defects, (3) a third party should be held jointly and severally liable, and (4) the Investor should be sanctioned for filing a frivolous appeal. We begin with the Agents' ancillary arguments, addressing all but the motion for sanctions, which we reserve until after conducting our merits analysis on the four other issues presented by the Investor.

## THE AGENTS' ANCILLARY ARGUMENTS

### A.    Jurisdiction

The Agents assert that we lack jurisdiction because the Investor is allegedly a fugitive and an adulteress. This issue has no basis in law or fact. There is no evidence that the Investor is a fugitive or an adulteress, and the only authorities cited by the Agents are two criminal cases, which are not on point. *See Estelle v. Dorrough*, 420 U.S. 534 (1975) (per curiam) (discussing a Texas statute that divested jurisdiction from the Court of Criminal Appeals if the defendant escaped from custody during the pendency of his appeal); *Smith v. United States*, 94 U.S. 97 (1876) (providing that the Supreme Court has the discretion to refuse to hear a criminal case if the defendant has escaped from custody).

7

**B. Motion to Dismiss**

In their next issue, the Agents submit an open-ended question, asking whether the appeal should be dismissed because the Investor did not post a supersedeas bond. The Agents have not presented this issue in a manner that comports with the Rules of Appellate Procedure; their brief contains no argument or conclusion whatsoever. The only discussion in the Agents' brief is a recitation of Rule 24.2(c), which pertains solely to the determination of a debtor's net worth. *See* Tex. R. App. P. 24.2(c).

Our rules allow for the involuntary dismissal of an appeal when the appellant has failed to comply with a court order. *See* Tex. R. App. P. 42.3(c). In this case, however, there is no indication that the Investor was ever ordered to post a bond, and the Agents have not cited to any authorities showing that the mere failure to do otherwise demands a dismissal. We overrule this issue as inadequately briefed. *See* Tex. R. App. P. 38.1(i); Tex. R. App. P. 38.2(a)(1).

In a separate issue, the Agents argue that the appeal should be dismissed because the Investor's husband was not joined as an indispensable party. The Agents submit that joinder is required because this case involves community property and we, as the reviewing court, cannot afford the Investor's husband complete relief unless he participates in the appeal. The Agents' premise is flawed: this case has nothing to do with the community interests of the Investor's property. The Investor's husband was not joined as a party at trial and there is no reason for requiring his participation here.

**C. Joint and Several Liability**

The Agents argue next that a third party, whom they identify as the man allegedly having an affair with the Investor, should be jointly and severally liable

for damages incurred in furtherance of a civil conspiracy. This issue is completely irrelevant because the trial court did not award any amount of damages for civil conspiracy. We overrule this issue.

## DIRECTED VERDICT

We now proceed to the merits of this appeal, beginning with the Investor's first three issues, which challenge the trial court's directed verdict.

### A.    Standard of Review

A trial court may direct a verdict in favor of the defendant if the evidence conclusively establishes a defense to the plaintiff's cause of action. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). For such matter of law questions, our review is de novo. *See JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 396 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). Under this standard, we must determine whether the record contains any evidence of probative value that raises a fact issue on the material questions presented in the suit. *See Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684 (Tex. 2004). We consider all of the evidence in the light most favorable to the party against whom the verdict was directed and disregard all contrary evidence and inferences. *See Coastal Transport Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234 (Tex. 2004).

### B.    Fraud

We start with the Investor's fraud claim because our analysis of this issue will guide our subsequent treatment on the claim for breach of contract.

Fraud claims have a four-year statute of limitations, which begins to run as soon as the cause of action accrues. *See* Tex. Civ. Prac. & Rem. Code § 16.004(a)(4). The accrual date is normally a question of law for the court to

9

decide. *See Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 567 (Tex. 2001). Generally, a cause of action accrues when a wrongful act causes a legal injury. *See Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011) (per curiam). Because the statute of limitations is an affirmative defense, the Agents assumed the burden of proving when the Investor's fraud claim actually accrued. *See* Tex. R. Civ. P. 94; *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex. 1990).

The Investor asserted a single claim of fraud, but her cause of action was actually based on three discernable promises: (1) that the Agents would locate properties for purchase that were 20% below market value; (2) that the Agents would lease any property within two weeks of closing; and (3) that each property would generate rental income at a 20% rate of return. The Investor would have suffered a distinct and actionable injury if any one of these alleged promises was not met. The burden accordingly fell on the Agents to show when the injuries occurred. *Cf. Haase v. Abraham, Watkins, Nichols, Sorrels, Agosto & Friend, LLP*, 404 S.W.3d 75, 89 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (where cause of action for legal malpractice was based on three separate factual allegations, the defendant had the burden of conclusively establishing when each factual allegation resulted in a legal injury to the plaintiff).

The evidence is undisputed that the Investor purchased all of her properties between December 2005 and April 2006. If the Investor suffered an injury relating to the Agents' first promise, then her cause of action necessarily accrued when the Investor purchased a property. At the time of purchase, the Investor knew or should have known whether her purchase price was 20% below market value. Similarly, if the Investor suffered an injury relating to the Agents' second promise, then her cause of action must have accrued two weeks after the purchase date. By that time, the Investor knew or should have known whether the property was

10

leased or vacant. Because any injury relating to the first two promises must have occurred more than four years before December 7, 2010, when the Investor filed her suit, we conclude that any fraud claims based on these promises were barred by the statute of limitations.

Our analysis of the third promise is somewhat more complicated. An injury relating to this promise would occur only if a property failed to generate rental income at a 20% rate of return. During the hearing on the motion for directed verdict, the trial court concluded that the Investor had only a single cause of action relating to this promise, and that it necessarily accrued in either the Spring of 2006, when the Investor suffered her cash flow problem, or on November 2, 2006, when the brokerage agreement finally expired. We perceive at least two problems with this reasoning.

First, the expiration of the brokerage agreement reveals nothing about when the Investor suffered an injury. The Investor's right to seek judicial relief depended on whether a property had generated income, not on whether the Agents had the exclusive right to represent the Investor. If the Investor owned a property that consistently performed well during the operational period of the brokerage agreement, an injury could have occurred if the property failed to produce income after the agreement was no longer in effect. The Investor indicated at trial that the Agents' promise was intended to continue indefinitely in this manner. Therefore, it was incumbent upon the Agents, as the movants below, to conclusively establish when the Investor suffered her injury. They failed to show that an injury occurred upon the simple expiration of the brokerage agreement. *Cf. Atkins v. Crosland*, 417 S.W.2d 150, 152–53 (Tex. 1967) (holding that an accountant in a professional negligence case had not conclusively established a limitations defense where the

11

accountant proved only the last day that he had represented the client, instead of the day that the client suffered his actionable tax injury).

The Agents correctly observe that an injury did occur in the Spring of 2006. The evidence is undisputed that, during this time period, the Investor experienced a cash flow problem because some of her properties were producing less income than what she had anticipated. The fact that some properties underperformed, however, does not mean that the Investor suffered actionable injuries with respect to *all* of her properties. If one property was overperforming while another property was underperforming, a cause of action would accrue for only the property that resulted in injury to the Investor.

This point brings us to our second problem with the directed verdict: the trial court did not conduct any sort of property-by-property analysis when assessing whether a cause of action had accrued. The court erroneously concluded that there was only one injury for limitations purposes when it should have acknowledged that the Investor might have had a separate injury and a separate cause of action for each property she owned. *Cf. Haase*, 404 S.W.3d at 89 (plaintiff had a separate injury and a separate cause of action for each allegation of legal malpractice). Because there is no indication that either the Agents or the trial court analyzed the properties on an individual basis, we must now turn to the evidence to see how many injuries the Investor suffered and whether the dates of injury, if any, were conclusively established.

There was virtually no live testimony at trial regarding the specific performance of individual properties. The best evidence we have on this particular issue is a detailed spreadsheet prepared by the Investor. The spreadsheet contains the following information for each property: (1) when the property was purchased, and its purchase price; (2) when the property was sold, and its sales price, if it was

12

sold at all; (3) the expenses attributable to the property; (4) the rental income expected from the property, based on a 20% rate of return; and (5) the total income actually produced by the property over the course of the Investor's ownership.

The spreadsheet reveals that eight properties were sold in May and October of 2006. In terms of performance, these properties ran the full gamut: five properties produced no income at all; two properties beat expectations and exceeded the 20% rate of return; and one property underperformed, producing less than 50% of what the Investor contended had originally been promised. The Investor suffered no injury with respect to the two properties that overperformed, unless there was a brief period of time in which they underperformed; the spreadsheet does not go into such depth. Assuming that the Investor had a cause of action for all eight properties, we can deduce that each cause must have accrued no later than the property's date of sale. By that time, the Investor knew or should have known whether she had suffered an injury. Because all of the properties were sold more than four years before the Investor filed suit, the statute of limitations barred any claim arising from those properties. In this respect, the Agents were properly entitled to a directed verdict.

The Investor retained one of the remaining properties and sold the other thirteen in 2007 or later, less than four years before suit was filed. The spreadsheet indicates that two of the properties overperformed, producing more rental income than what the Investor contended had been promised. If the Investor suffered an injury with respect to either of these properties because of a momentary period of underperformance, the date of such injury is not apparent from the record. Unlike with the previous two overperforming properties that were sold in 2006, we cannot determine with any certainty that an injury regarding these properties, if any, necessarily occurred more than four years before the Investor filed her suit.

13

Accordingly, the Agents did not carry their burden of conclusively establishing that the statute of limitations barred any claim relating to these properties.

Seven more properties produced some amount of rental income, but at less than a 20% rate of return. The spreadsheet does not indicate whether these properties consistently underperformed since the date of purchase (making the Investor's injuries more than four years old at the time of suit), or whether they underperformed only at some later date (conceivably placing the Investor's suit within the limitations period). The accrual date for any cause of action relating to these properties was not conclusively established.

The final five properties were held for more than two years, through June 2008, but according to the spreadsheet, they produced no income during that entire period of ownership. Despite this apparent failure to generate rents, a finder of fact could determine, based on other evidence in the record, that the properties had not underperformed consistently since their dates of purchase. The Investor testified that more than $18,000 in rents had not been recorded in her spreadsheet because she was unable to identify the exact properties to which the rents should be credited. The Investor also testified that, on one occasion, the Agents had reported that all of her properties were fully occupied. Viewing this evidence in the light most favorable to the Investor, a reasonable juror could infer that one or more of these five remaining properties had been leased for some length of time at the rate promised by the Agents. A date of injury, if any, was not conclusively established.

The Agents carried their burden of showing that the statute of limitations barred a fraud claim arising from some of the Investor's properties, but not all of them. The trial court erred to the extent it granted a directed verdict on those claims for which a date of injury had not been proven.

14

When a trial court makes an error of law, its judgment should not be reversed unless the error "probably caused the rendition of an improper judgment." *See* Tex. R. App. P. 44.1(a)(1). An error committed in the context of a directed verdict does not result in the rendition of an improper judgment if the record supports a separate reason for granting the directed verdict. *See Gomer v. Davis*, 419 S.W.3d 470, 476 (Tex. App.—Houston [1st Dist.] 2013, no pet.). On appeal, we may consider any theory in support of the trial court's judgment, even if it was not expressly stated in the motion for directed verdict. *See Indus. III, Inc. v. Burns*, No. 14-13-00386-CV, 2014 WL 4202495, at *8 (Tex. App.—Houston [14th Dist.] Aug. 26, 2014, no pet. h.) (mem. op.).

The Agents assert as a cross-point that a directed verdict was appropriate because the Investor failed to produce evidence supporting an essential element of her claim. A directed verdict may be granted because of insufficient evidence. *See Exxon Mobil Corp. v. Kinder Morgan Operating L.P.*, 192 S.W.3d 120, 126 (Tex. App.—Houston [14th Dist.] 2006, no pet.). We must therefore review the evidence applying the legal sufficiency standard set forth in *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). Under this standard, we may not sustain a challenge to the sufficiency of the evidence unless (1) there is a complete absence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810.

To establish a cause of action for fraud, the plaintiff must demonstrate each of the following elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the representation was made, the defendant knew it was false or made it recklessly without any knowledge of the truth and as a

positive assertion; (4) the defendant made the representation with the intent that the plaintiff should act upon it; (5) the plaintiff acted in reliance on the representation; and (6) the plaintiff thereby suffered an injury. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). If the representation is a promise of future performance, the plaintiff must further demonstrate that the defendant made the promise with no intent of performing it. *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam).

Assuming the existence of an enforceable promise, the Agents argue that there is no evidence that they made the promise while having no intent to perform it. We agree.

A promise of future performance is actionable in fraud only if, at the time the promise was made, the promisor intended to deceive and had no intention of performing. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). Showing that a party had no intent to perform "is not easy," as such matters are not usually susceptible to direct proof. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006). The failure to perform, standing alone, is no evidence of intent. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). Similarly, a party's denial that a promise had been made is not legally sufficient evidence of fraudulent inducement. *See Tony Gullo*, 212 S.W.3d at 305; *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992). The claimant must present some circumstantial evidence, however slight, showing an intent to deceive. *See Spoljaric*, 708 S.W.2d at 435.

In this case, the Agents' only alleged promise as to which limitations does not fully bar the Investor's fraud claim was that they would lease any property the

16

Investor purchased at a rate that guaranteed a return on investment of at least 20%. The Investor has not cited, and we cannot find, any evidence that would support a finding that the Agents had a present intent to deceive the Investor when this promise was allegedly made. In fact, the evidence conclusively showed that the Agents partially performed the promise, despite their denial of having made it.

The evidence showed, for instance, that the Agents executed management contracts for each of the Investor's properties with the express purpose of leasing them on the Investor's behalf. Many, if not all, of the properties were leased, and at least four produced rental income that exceeded the Investor's expectations. The Agents also testified that they went "the extra mile" to find tenants from a nearby city who had been displaced by a natural disaster. This undisputed evidence of partial performance negated the Investor's claim of fraud. *See Reyna v. First Nat'l Bank in Edinburg*, 55 S.W.3d 58, 68 (Tex. App.—Corpus Christi 2001, no pet.) (holding that defendants' tender of partial payment negated any claim that they had no intention of paying for equipment); *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 446 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (holding there was no evidence that party made representations with intent not to perform on note when the party subsequently made payment for five years). Therefore, as to those fraud claims that could not be dismissed on the basis of limitations, the Agents were still entitled to a directed verdict on no-evidence grounds.

## C.    Breach of Contract

A breach of contract occurs when a party fails or refuses to do something that was promised. *See Seureau v. ExxonMobil Corp.*, 274 S.W.3d 206, 227 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The cause of action accrues immediately upon the breach, and the statute of limitations runs for four years from

the date of accrual. *See* Tex. Civ. Prac. & Rem. Code § 16.051; *Barker v. Eckman*, 213 S.W.3d 306, 311 (Tex. 2006).

The Investor alleged in her pleadings that the Agents breached a contract in three ways: (1) by failing to find properties that would appreciate in value; (2) by failing to get tenants for her properties "for many months"; and (3) by failing to lease her properties at a rate that yielded a 20% return on her investment. Essentially, the Investor claimed that the Agents failed to perform the same three promises that were the focus of her claim for fraud.

The Investor did not identify in her pleadings a written contract that expressly contained the terms of these promises. Instead, the Investor testified at trial that the parties bargained for these promises when they executed their brokerage agreement. The Investor referred specifically to the handwritten clause at the end of the brokerage agreement, which mentioned an additional payment of $1,000 upon the purchase of any condo. The Investor testified that she purchased the Agents' promises as a guaranty whenever she paid this extra $1,000.

The brokerage agreement did not contain any sort of merger or integration clause. In the absence of such a provision, the trial court indicated that it would accept the Investor's theory of contract formation, if only for argument's sake. Indulging every inference in favor of the Investor, the court concluded that the Investor's suit would still be time-barred. As the court explained, if the promises had been included in the brokerage agreement, then the Agents' duty to perform those promises lapsed when the brokerage agreement expired. Therefore, any cause of action arising out of the brokerage agreement would have accrued no later than November 2, 2006, more than four years before the Investor filed her suit.

18

We agree with the trial court's reasoning on this issue.[6] *See Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship*, 323 S.W.3d 203, 216–17 (Tex. App.—El Paso 2010, pet. denied) (breach of contract action was mature upon expiration of contract extension). The Investor, however, disputes that her cause of action accrued upon the simple expiration of the brokerage agreement. She counters that her claim is based on a series of continuing agreements, which included the purchase of her properties, the management of those properties, and the guaranty that those properties would be fully occupied at a 20% rate of return. Under this theory of the claim, the Investor asserts that her cause of action accrued in January 2007, because that is when she terminated her contractual relationship with the Agents.

Assuming there were a valid continuing agreement, the Investor's theory would only save a contract claim based on a breach of the third alleged promise. And even then, the Investor's claim would necessarily be limited to those fourteen properties that had not been sold in 2006. Any cause of action arising from a breach of the first two alleged promises would have accrued more than four years before suit was filed, for the same reasons we discussed in the previous section: the Investor knew or should have known at the time of closing whether her purchase price was 20% below market value, or within two weeks of closing, whether the property had been leased by the Agents.

The Agents argue by cross-point that the "Four Corners Rule" would apply even if the statute of limitations did not preclude a suit based on a continuing

---

[6] In a previous section of this opinion, we indicated that the expiration of the brokerage agreement would not factor into our consideration of whether the statute of limitations had barred a claim for fraud. That claim, however, did not depend on proof of a valid and effective contract. Because the expiration of a contract would affect a claim based on a breach of the contract, we can consider, in an analysis of this claim, when the brokerage agreement was operational.

agreement. The Agents mention this rule in their argument that the third promise was not enforceable. They describe the rule as requiring the trial court to look only "at the words of the contract, not prior drafts or exchanges of letters or other documents or testimony to determine the intent of the parties." This description invokes the parol evidence rule as an independent basis for supporting the trial court's directed verdict. *See Franklin Templeton Bank & Trust v. Tigert*, No. 05-09-01472-CV, 2011 WL 2507834, at *6 (Tex. App.—Dallas June 24, 2011, no pet.) (providing that a court construes contracts "from their four corners, by review of the plain language, and without regard for parol evidence").

The parol evidence rule is a rule of substantive law, not a rule of evidence. *See Hubacek v. Ennis State Bank*, 159 Tex. 166, 169, 317 S.W.2d 30, 31 (1958). When parties reduce an agreement to writing, the law of parol evidence presumes, in the absence of fraud, accident, or mistake, that any prior or contemporaneous oral or written agreements merged into the final written agreement. *See DeClaire v. G&B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Any provisions not set out in the writing are presumed to have been abandoned before execution of the agreement or, alternatively, they are presumed to have never been made. *Id.*

Evidence that violates the parol evidence rule has no legal effect and "merely constitutes proof of facts that are immaterial and inoperative." *See Piper, Stiles & Ladd v. Fid. & Deposit Co. of Md.*, 435 S.W.2d 934, 940 (Tex. Civ. App.—Houston [1st Dist.] 1968, writ ref'd n.r.e.). Such evidence cannot be considered by the court when it construes the contract, even if the evidence is admitted without objection. *See Johnson v. Driver*, 198 S.W.3d 359, 364 (Tex. App.—Tyler 2006, no pet.).

20

There are exceptions, however. Parol evidence may be admitted to show (1) that the contract was induced by fraud, accident, or mistake; (2) that an agreement was to become effective only upon certain contingencies; or (3) in the case of ambiguity, that the parties' true intentions differ from those expressed in the agreement. *See Gonzalez v. United Bhd. of Carpenters & Joiners of Am., Local 551*, 93 S.W.3d 208, 211 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Parol evidence may also be admitted under an additional exception to show collateral, contemporaneous agreements that are consistent with the underlying written agreement. *See DeClaire*, 260 S.W.3d at 45. However, this exception does not permit parol evidence that varies or contradicts the express or implied terms of the written agreement. *Id.*

It is undisputed that the Agents' third promise was never reduced to writing. There is also no dispute that the Investor believed she was purchasing this promise when she agreed to pay the Agents a $1,000 commission upon the acquisition of any condo. The Investor's testimony conclusively shows that the promise was negotiated at the same time as the brokerage agreement:

> Q.  All right, but didn't it scare you that they're saying sign this English language contract; we're not showing you any properties until you sign it and you felt there were holes in their information?
>
> A.  Because it was made very clear on the Chinese newspaper and they, also, promised to provide guaranty if I pay extra $1,000 per unit.
>
> Q.  Okay. I'm sorry. I didn't hear the translator about the Chinese newspaper.
>
> THE INTERPRETER:   Yeah, the Chinese newspaper made it very clear.
>
> Q.  What was clear about the Chinese newspaper?

21

A.    What we saw on the Chinese newspaper and what was told by them were very clear, that is the tenant would be government sponsored tenant and the properties will have – would have 100 percent occupancy rate and 20 percent return on the investment. If I paid extra $1,000, they would guaranty 100 percent – 100 percent and provide one stop shopping services.

Q.    Did you reach an understanding with them as to what one stop shopping services meant?

A.    They guaranty to sell below to buy – they guaranty buy – they guaranteed to help me purchase the lowest priced properties that were 20 percent lower than those of the property, those properties that represented by other agents.

Q.    Okay. What else?

A.    They guaranteed to lease those out in two weeks, 100 percent occupancy rate in two weeks, 20 percent return on the investment.

This guaranty clearly varied the terms of the brokerage agreement. The handwritten clause at the end of that agreement provided only that the Agents would be entitled to a $1,000 commission if the Investor purchased a condo. The clause did not further provide that the commission would be paid in consideration of an additional promise that the property would generate a minimum return on investment of 20%, or that this promise would continue indefinitely beyond the express termination of the brokerage agreement.

The Investor's testimony about the third promise qualified as parol evidence, meaning that it could not be considered unless an exception applied. As a matter of law, we conclude that no exception could have applied. There were no allegations of accident or mistake. Although the Investor pleaded a cause of action for fraud in connection with the promise, she produced no evidence of fraud, as we explained in the previous section. *See Tex. A&M Univ.-Kingsville v. Lawson*, 127 S.W.3d 866, 872 (Tex. App.—Austin 2004, pet. denied) (fraud exception does not apply

"absent pleading and proof"). Furthermore, there was no evidence of any contingencies, and the brokerage agreement is not ambiguous.

The third promise expanded the Agents' obligations under the express terms of the brokerage agreement. Therefore, any evidence relating to the promise is of no legal effect. Having decided that the Investor's evidence regarding the promise was in violation of the parol evidence rule, we conclude that the Investor had no viable claim for breach of the promise. The only contract connected with the promise was the brokerage agreement, and there is no evidence that the Agents breached it. The Agents were entitled to a directed verdict on this issue.

## D.     Breach of Fiduciary Duty

A claim for breach of fiduciary duty has a four-year statute of limitations. *See* Tex. Civ. Prac. & Rem. Code § 16.004(a)(5). The Investor alleged only a single breach in her pleadings. She claimed that the Agents had misappropriated a rent check by forging her endorsement and keeping the funds for themselves.

The evidence is undisputed that the check was cashed in August 2006. Assuming there were a breach of a fiduciary duty, the Investor's cause of action accrued at the moment the Agents negotiated the check. Because that date of accrual was more than four years before suit was filed, the Investor's claim would be time-barred unless she raised a fact issue in avoidance of the statute of limitations.

The Investor responds that the statute of limitations should be tolled because of the discovery rule. The Investor asserted the discovery rule in her pleadings, claiming that she did not discover the Agents' actions until April 2007. The pleadings are not evidence, however, and the Investor never testified at trial when she first learned about the misappropriated check. *See Laidlaw Waste Sys.*

23

*(Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995) ("Generally, pleadings are not competent evidence, even if sworn or verified.").

The Agents had no burden to negate the discovery rule unless it was both pleaded and proved. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988) (noting, outside the context of a motion for summary judgment, that the "party seeking to benefit from the discovery rule must also bear the burden of proving and securing favorable findings thereon"). Without any proof submitted in support of the Investor's counter-affirmative defense, the Agents conclusively established that the Investor's claim was time-barred. The trial court correctly granted a directed verdict on the basis of limitations.

The Investor argues that a separate claim for self-dealing survived the statute of limitations. The Investor specifically asserts that the Agents breached a fiduciary duty when they represented her in the purchase of two properties for which they held an undisclosed ownership interest. This theory had not been asserted in the pleadings, but it was discussed during the hearing on the motion for directed verdict, and there was some evidence in the record to support such a theory.

Assuming that this theory were tried by consent, we would still conclude that the Agents were entitled to a directed verdict, even if the statute of limitations did not apply. To recover on a breach of a fiduciary duty, there must be some proof of an injury to the plaintiff or a benefit to the defendant as a result of the defendant's breach. *See Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Here, the Investor never testified about the two properties in question, their market values at the time of purchase, or whether the Agents had realized any gains. Accordingly, there is no evidence that the

Investor was injured or that the Agents benefited from the transactions. The Agents were entitled to a directed verdict on no-evidence grounds.

In another attempt to expand on her pleadings, the Investor argues that the Agents breached their fiduciary duties in two more ways: first, by guaranteeing a 20% return on investment, and second, by advising the Investor that she needed to be patient when her rental income was not being generated at the rate she expected. The Agents did not receive any notice that these theories would be tried, and in fact, they were never discussed at all during the hearing on the motion for directed verdict. The Investor cannot defeat a trial court's directed verdict by attempting to establish new causes of action and new fact issues for the first time on appeal. *See* Tex. R. App. P. 33.1. We overrule this issue to the extent she attempts otherwise.

## ATTORNEY'S FEES

In her fourth issue, the Investor challenges the award of attorney's fees to the Agents, contending that the trial court erroneously granted the award on a theory that had not been asserted in the pleadings. In the alternative, the Investor argues that the award should be reversed because no trial on attorney's fees was ever held and the Agents submitted no evidence in support of the award.

Under Texas law, a party may not recover attorney's fees unless authorized by statute or contract. *See Gulf State Utils. Co. v. Low*, 79 S.W.3d 561, 567 (Tex. 2002). The Agents pleaded for attorney's fees on a single statutory basis, citing the Uniform Declaratory Judgments Act. *See* Tex. Civ. Prac. & Rem. Code § 37.009. This statute cannot support the trial court's judgment because the Agents abandoned their counterclaim for declaratory relief.

The trial court recited in its judgment that the Agents were entitled to attorney's fees because they had requested such fees under Chapter 38 of the Texas

25

Civil Practice and Remedies Code. Our review of the record does not reveal any such request in the Agents' pleadings. Even if we assumed that a request had been made, the trial court had no discretion but to deny it. Attorney's fees may be awarded under Chapter 38 for presenting a contract claim, but not for defending against one. *See Chevron Phillips Chem. Co. v. Kingwood Crossroads, L.P.*, 346 S.W.3d 37, 70 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ("Section 38.001(8) does not authorize recovery of attorney's fees for successfully defending a contract claim."). In this case, the Agents presented no contract claim of their own; they merely defended against the Investor's.

The Agents argue that their award should be upheld because the Investor stipulated to the issue of attorney's fees in open court. The Agents refer to a brief declaration at the end of the directed verdict hearing when the trial court encouraged the parties to reach a consensus on attorney's fees. The Investor's attorney stated as follows: "I can probably agree to the amount. I can't agree that they're owed." This statement falls far short of a stipulation. It does not support the notion that the Agents incurred $50,000 in attorney's fees, and it runs directly contrary to the Agents' position that they should recover attorney's fees from the Investor. Absent any other showing that the Investor agreed to pay the Agents' attorney's fees, we cannot say that there was any stipulation to the award contained in the trial court's judgment.

"A trial court cannot enter judgment on a theory of recovery not sufficiently set forth in the pleadings or otherwise tried by consent." *Heritage Gulf Coast Props., Ltd. v. Sandalwood Apartments, Inc.*, 416 S.W.3d 642, 658 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The Agents' pleadings did not put the Investor on notice of any right to recover attorney's fees except for the Uniform Declaratory Judgments Act. Because that theory is inapplicable here, and because the Agents

26

did not otherwise try the issue of attorney's fees by consent, we conclude that the trial court abused its discretion by making the award of attorney's fees. We accordingly modify the judgment to delete the award. *See Garcia v. Nat'l Eligibility Express, Inc.*, 4 S.W.3d 887, 889 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (op. on reh'g) (deleting award of attorney's fees where party failed to show that any statute or contract authorized the award).

## MOTION FOR SANCTIONS

The Agents have moved for sanctions, claiming that the Investor's appeal is frivolous. If an appeal is frivolous, an appellate court may award the prevailing party just damages. *See* Tex. R. App. P. 45. To determine whether an appeal is frivolous, we review the record from the viewpoint of the advocate and decide whether there were reasonable grounds to believe the case could be reversed. *See Glassman v. Goodfriend*, 347 S.W.3d 772, 782 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (en banc). Because we have already decided that the award of attorney's fees should be deleted, we conclude that the Investor's appeal is not frivolous, and we deny the motion for sanctions.

## THE AGENTS' DECORUM

On our own motion, we feel compelled to address the alarming lack of civility demonstrated by the Agents' pro se filings in this court. Between their briefs and other motions, the Agents have made many ad hominem attacks against the Investor and opposing counsel. These attacks are completely inappropriate and ineffective. Pro se litigants, much like parties who are represented by counsel, should focus on legal points, not on personalities or perceived character flaws.

All participants in the legal process should treat each other with the same level of respect and courtesy that is owed to this court. Should the Agents decide in

future dealings with this court to conduct themselves in an impolite or unprofessional manner, their behavior may result in serious consequences, including contempt or other sanctions. *See Gleason v. Isbell*, 145 S.W.3d 354, 355–61 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (Frost, J., concurring in part and dissenting in part).

## CONCLUSION

We deny the motion for sanctions and, having modified the judgment to delete the award of attorney's fees, we affirm the trial court's judgment as modified.


/s/ Tracy Christopher
Justice


Panel consists of Justices Christopher and Busby and Visiting Judge Hinde.*

*The Honorable Dan Hinde, Judge of the 269th District Court of Harris County, sitting by assignment pursuant to section 74.003(h) of the Texas Government Code.