**Affirmed in Part, Reversed and Rendered in Part, and Reversed and Remanded in Part, and Memorandum Opinion filed July 6, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00732-CV

### HOUSTON METRO ORTHO AND SPINE SURGERY, LLC; ELITE AMBULATORY SURGERY CENTERS, LLC; LORI RAMIREZ; JAMES ALBRIGHT, M.D.; CARL PALUMBO, M.D.; NAVIN SUBRAMANIAN, M.D.; ALAN RECHTER, M.D.; MARK PROVENZANO, M.D.; JUAN CARLOS BUSTOS, M.D.; ASIF CHAUDRY, M.D.; AND NEWTON DUNCAN, M.D., Appellants

### V.

### JUANSRICH, LTD., AND RICHARD FRANCIS, M.D., Appellees

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2015-24460**

## MEMORANDUM OPINION

Appellee Richard Francis, M.D., through his business entity, appellee Juansrich, Ltd. (collectively "Juansrich"), owned an interest in appellant Houston Metro Ortho and Spine Surgery, LLC ("Metro"), an ambulatory surgical center.

Juansrich shared ownership in Metro with several other surgeons, including appellants James Albright, M.D., Carl Palumbo, M.D., Navin Subramanian, M.D., Alan Rechter, M.D., Mark Provenzano, M.D., Juan Carlos Bustos, M.D., Asif Chaudry, M.D., and Newton Duncan, M.D. Appellant Elite Ambulatory Surgery Centers, LLC ("Elite") also owned an interest in Metro and managed the daily operations of the surgery center. Appellant Lori Ramirez was an officer of Elite. As Class A members of Metro, the surgeons agreed, among other things, that each would conduct a certain percentage of their eligible procedures at Metro. A dispute began when appellants believed Dr. Francis had stopped performing procedures at Metro.

Metro terminated Juansrich's ownership interest in Metro. It then filed suit against Dr. Francis seeking to enforce a noncompetition agreement contained in the "Company Agreement of Houston Metro Ortho and Spine Surgery Center LLC" (the "LLC Agreement"). Believing it was owed significant sums as payment for its ownership interest in Metro, as well as for missed distributions of earnings made while it was still a member of Metro, Juansrich filed counterclaims alleging numerous causes of action including breach of contract, conversion, aiding and abetting, and unjust enrichment. The trial court granted Dr. Francis's motion for partial summary judgment asserting that the noncompetition agreement was unenforceable. It then realigned the parties making Juansrich the plaintiff. The trial court subsequently granted two Rule 166 motions filed by Juansrich and conducted a bench trial on the remaining issues. At the conclusion of the bench trial, the trial court found in favor of Juansrich. Juansrich elected to recover on its conversion cause of action. The trial court signed a final judgment awarding (1) Juansrich $9,855,596.85 in damages on Juansrich's conversion cause of action and $23,048.50 in attorney's fees in connection with Juansrich's efforts to inspect

Metro's records, and (2) Dr. Francis $403,918.15 in attorney's fees and costs for defending against Metro's noncompete claim.

Because Metro has not challenged the $23,048.50 attorney's fees award on appeal, we affirm that part of the trial court's final judgment. Concluding that none of Juansrich's tort claims can support the final judgment, we reverse the trial court's final judgment based on conversion and render judgment that Juansrich take nothing on those claims. In addition, because the primary purpose of the LLC Agreement was not for the provision of personal services, we reverse and render judgment that Dr. Francis take nothing on his request for attorney's fees for defending against Metro's suit seeking to enforce the non-compete contained in the LLC Agreement. We conclude that the trial court erred when it granted Juansrich's first and second Rule 166 motions, which Juansrich relied on to support its breach of contract cause of action. As a result, Juansrich cannot now elect to recover on its breach of contract claim seeking payment for its ownership interest. We therefore remand that cause of action to the trial court for further proceedings. Finally, we conclude that the evidence is legally sufficient to support the trial court's judgment on Juansrich's claim for missed distribution payments. We therefore affirm that part of the trial court's final judgment.

## BACKGROUND

Dr. Francis is an orthopedic surgeon. Dr. Francis and Dr. Rechter, another orthopedic surgeon, were the original doctors involved in the formation of Metro. Ramirez, Elite's chief executive officer, was the moving force in the formation of Metro and the recruitment of doctors as investors in Metro. Metro is an ambulatory surgery center that specializes in orthopedic, pain management, spine, and pediatric ear, nose, and throat procedures. As an ambulatory surgery center, Metro performs only outpatient surgery cases. Metro's Class A members consist

3

entirely of doctors and some of those doctors' business organizations. Juansrich is a Class A member and it eventually owned about 19.50 units of Class A membership in Metro.[1] Juansrich paid a total of $195,000 for those units. The doctor appellants are all Class A members of Metro. Elite is the sole Class B member. Elite handles the day-to-day business operations of the surgical center, such as managing the staff.

As with all limited liability companies, Metro is governed by a contract, the LLC Agreement. *See* Tex. Bus. Orgs. Code Ann. § 101.052. Among the key provisions in the LLC Agreement are sections 2.3, 4.3, and 10.7.

## Section 2.3

Section 2.3(b)(iv) provides that each Class A member "shall perform at least one-third of such Class A Member's procedures that require or can be performed at an ambulatory surgery center at the [Metro] Center."

## Section 4.3

Section 4.3 addresses redemption of members' ownership interests. Section 4.3 divides terminating events with respect to a member's ownership interest as either "Adverse Terminating Events" or "Non-Adverse Terminating Events." It further provides that the redemption price for a Class A member's units "shall be based on whether the Terminating Event is an Adverse Terminating Event or a Non-Adverse Terminating Event." An Adverse Terminating Event occurs when, among other events not at issue here, a Class A Member materially breaches the LLC Agreement. A Non-Adverse Terminating Event occurs with respect to a Class A Member if, among other things, the Class A Member is removed "for any reason or no reason," by "Supermajority Approval." The redemption price is also

---

[1] The LLC Agreement defines "Unit" as "a unit or share of interest in the Company."

4

affected by whether Metro has become "Operational" as defined in the LLC Agreement. Metro becomes "Operational" once it "is Medicare certified as an ambulatory surgical center." If Metro is not "Operational," or the termination is "Adverse," then the redemption price for a departing Class A Member's Units is limited to the departing Member's capital contribution. If Metro is "Operational," and the termination is "Non-Adverse," the redemption price is determined by a formula found in section 4.3(g)(ii) of the LLC Agreement.

**Section 10.7**

Section 10.7 of the LLC Agreement contains a non-competition clause. It provides that

> [d]uring the term of a Class A Member's membership in [Metro], and for a period of one year thereafter, no Class A Member nor any of such Class A Member's Affiliates, except as provided below or through [Metro], shall, without prior written Consent of the Class B Member, directly or indirectly own, manage, operate, control, or participate in any manner in the ownership, management, operation, or control of, or serve as a partner, employee, principal, agent, consultant, or otherwise contract with, or have any financial interest in, or aid or assist any other person or entity that operates a facility (including an ambulatory surgical center or office-based or practice-based facility or operating site or room that provides any of the services offered by [Metro]) to provide outpatient surgical services, including a state-licensed, Medicare-certified or accredited surgery center or office-based surgical facility, within 10 miles of the location of [Metro's ambulatory surgical center] (the "Restricted Territory") nor may a Class A Member provide Facility Fee Procedures in such Class A Member's office. The preceding sentence shall not be construed to prevent a Class A Member or any of a Class A Member's Affiliate's from (i) maintaining staff privileges at any facility, (ii) providing professional surgical services and earning a professional fee thereon (but not acting as an owner or having a compensation or financial relationship) in any other ambulatory surgical center or hospital, (iii) performing any in-office procedures under local anesthesia that does not require the presence of an anesthesiologist or

a certified registered nurse anesthetist, or (iv) having any financial relationship or owning an interest in any hospital within the Restricted Territory. For purposes of this Section 10.7, it shall be presumed that a person or entity competes with [Metro] and violates this provision if such person or entity has any interest in any facility or center of any type whatsoever for the conduct of, or compensation relationship with, any outpatient surgery center within the Restricted Territory.

**The beginning of the Practice**

In a "Confidential Private Offering Memorandum for Accredited Investors Only," dated May 6, 2011, Metro notified potential investors that

> THERE IS NO CURRENT SURGERY CENTER. CONSEQUENTLY, THE SURGERY CENTER HAS NO OPERATIONAL HISTORY AND CURRENTLY CONDUCTS NO BUSINESS. IT IS CONTEMPLATED THAT THE SURGERY CENTER WILL NOT CONDUCT ANY OPERATIONS OR BUSINESS UNLESS AND UNTIL SUFFICIENT SUBSCRIPTIONS ARE RECEIVED AND ACCEPTED PURSUANT TO THIS OFFERING (THE MINIMUM AMOUNT OF WHICH IS YET TO BE DETERMINED BY THE COMPANY).

That same offering memorandum further warned potential investors that Metro did "not intend to service Medicare or Medicaid patients." Metro repeated those same warnings in a second confidential memorandum for potential investors dated January 1, 2012. Metro's business model was to operate as an out-of-network facility unaffiliated with managed care providers. Under this model, Metro did not contract with insurance companies on the rates that would be charged for procedures, instead the doctors would submit their normal charges and wait on reimbursement. By choosing this model, the doctors expected "to have reimbursement, in most cases, that is significantly higher than what they might be able to receive on a contracted basis."

Metro opened its doors to patients in April 2012. Metro was initially very successful. Dr. Francis was one of the main reasons for that success. He

performed the most procedures at the Metro surgery center and as a result, he was consistently responsible for more than twenty percent of Metro's revenues. Dr. Francis also served as chairman of Metro's board.

**The Change in the Practice and the Board vote**

Problems began to arise in 2014 when two large insurance companies stopped paying Metro for services rendered to their insureds. As a result, Dr. Francis began performing more of his procedures at other facilities. Concerned, his fellow surgeons and Ramirez attempted to communicate with Dr. Francis. Those efforts were generally unsuccessful. Dr. Francis did, however, talk with Dr. Rechter. Dr. Francis told Dr. Rechter that while he was committed to Metro, he was not going to continue performing surgeries at the center if payment would not be received. In addition, Dr. Francis's appearances at the surgery center noticeably declined and he stopped attending board meetings. The Metro board voted unanimously on October 31, 2014, to remove Juansrich as a member. Ramirez notified Juansrich of the board's decision. Several days later, Dr. Francis responded that he acknowledged and accepted the board's decision. Juansrich's membership units went back into Metro's treasury. Metro placed $195,000, Juansrich's capital contribution to obtain its membership units, in escrow. Metro eventually tendered the $195,000 payment to Juansrich, but it was rejected. Several of the remaining Class A members acquired those former Juansrich membership units out of the Metro treasury in 2015. Each purchase was authorized by a vote of the Metro board. Metro made no distributions for earnings in September or October 2014.[2] Distributions resumed in December 2014 when Metro distributed $1,043,600.37. In late 2017, the Metro members sold 50.1

---

[2] Metro had historically made distributions of a month's earnings in the middle of the following month. September and October 2014 were the first months where no distributions occurred.

percent of their interest in Metro to Nobilis Health Corporation for $21,446,364.

**The Lawsuit**

Metro filed suit against Dr. Francis in 2015 alleging that he had violated the noncompete contained in the LLC Agreement. Juansrich intervened. Juansrich alleged a breach of contract cause of action seeking payment for the redemption of its units and its proportionate share of the December 2014 distribution. Juansrich also alleged conversion, aiding and abetting, and unjust enrichment claims based on the same facts. Dr. Francis moved for summary judgment arguing that the noncompete found in the LLC Agreement was unenforceable. The trial court granted Dr. Francis's motion. In additional rulings, the trial court (1) awarded Dr. Francis $403,918.15 in attorney's fees and costs pursuant to the noncompete statute; (2) awarded Juansrich $23,048.50 in attorney's fees in connection with Juansrich's efforts to inspect Metro's company records; and (3) granted Juansrich's no-evidence motion on all of Metro's remaining affirmative claims for relief. In addition, the trial court realigned the parties making Juansrich the plaintiff.

As the trial date approached, Juansrich filed two motions pursuant to Rule 166 of the Texas Rules of Civil Procedure. *See* Tex. R. Civ. P. 166 (authorizing trial court to schedule a pre-trial conference during which it may consider, among other things, "contested issues of fact and simplification of the issues," "identification of legal matters to be ruled on or decided by the court," and "such other matters as may aid in the disposition of the action.").

**The first 166 motion**

The first motion argued that Metro's termination of Juansrich was non-adverse. Juansrich then argued that the undisputed facts showed that it had not violated the LLC Agreement. The motion relied on Metro's corporate deposition

8

which identified two alleged breaches, violating the one-third procedures rule and violations of the non-compete in the LLC Agreement. Juansrich argued that there was no violation of the one-third of procedures rule because the period for measuring compliance with the rule was Metro's prior fiscal year, and Metro had admitted Francis had complied with the rule for that year. Juansrich then argued there could be no breach of the non-compete because the trial court had granted Dr. Francis's motion for summary judgment arguing the non-compete was unenforceable. The trial court granted Juansrich's first Rule 166 motion.

**The second 166 motion**

In the second Rule 166 motion, Juansrich argued that the trial court could rule as a matter of law that at the time of Juansrich's termination, Metro was "Operational" as defined in the Metro Agreement. In other words, Metro had been Medicare certified as an ambulatory surgical center. Juansrich based this argument on alleged judicial admissions by Metro admitting that Metro became "Operational" on May 22, 2011. According to Juansrich, this occurred three separate times, all in relation to Metro's summary judgment motion arguing that Juansrich's termination was adverse: (1) a sentence in a supplemental motion for summary judgment on the subject filed by Metro stating that "Here, Metro became operational on May 22, 2011;" (2) a Metro lawyer stating during the summary judgment hearing that Juansrich "withdrew within five years after Metro became operational;" and (3) a Power Point slide stating that "Metro became operational on May 22, 2011." The trial court granted this Rule 166 motion as well.

**The Bench Trial**

The case proceeded to a contentious trial before the bench. At the conclusion of the evidence, the trial court found in favor of Juansrich. It subsequently signed findings of fact and conclusions of law supporting recovery on

theories of conversion, aiding and abetting, unjust enrichment, and breach of contract. Juansrich elected to recover for conversion. The trial court's final judgment awarded Juansrich $9,855,596.85 on Juansrich's conversion cause of action, plus attorney's fees and costs for defending against Metro's noncompete claim. The judgment also ordered that Juansrich recover $23.048.50 in attorney's fees awarded pursuant to section 3.152(c) of the Texas Business Organizations Code. *See* Tex. Bus. Orgs. Code Ann. § 3.152(c) (authorizing award of attorneys' fees "in a suit to require a filing entity to open its books and records"). This appeal followed.

ANALYSIS

Metro raises numerous issues on appeal challenging most of the trial court's judgment. It does not challenge the trial court's award of attorney's fees awarded pursuant to the statute regulating access to a company's financial records. *See id.* Metro also does not dispute that it owes Juansrich something; it argues the recovery is limited to the return of Juansrich's capital contribution. With that introduction, we turn to Metro's issues.

## I. Because an express contract covers the dispute, Juansrich cannot recover under tort theories.

### A. Conversion

Metro argues in its first issue that the trial court erred when it found that Metro and several of its members had converted Juansrich's Metro membership units because the dispute is governed by a contract, the LLC Agreement. Metro then asserts that a case from this court, *Exxon Mobil Corporation v. Kinder Morgan Operating, L.P.*, controls the outcome here. 192 S.W.3d 120, 126–27 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

In *Exxon Mobil*, we explained that the independent injury rule provides that

10

"when the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract." *Id.* at 127. We further explained that "when the contract spells out the parties' respective rights about a subject matter, the contract–not common law tort theories–governs any dispute about the subject matter." *Id.* We then rejected Exxon Mobil's conversion claim because "(1) the only loss Exxon Mobil complains of is the propane, which is the subject of the contract, and (2) the contract spells out the parties' respective rights regarding the processing of the propane." *Id.* at 128 (internal citations omitted). This rule was recognized by the Supreme Court of Texas in *Chapman Custom Homes, Inc. v. Dallas Plumbing Company*, 445 S.W.3d 716, 718 (Tex. 2014). There, the Court stated that "the economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Id.* It went on to explain that the economic loss rule does not bar all tort claims arising out of a contractual setting. *Id.* The court observed that "a party states a tort claim when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit." *Id.*

Here, we are presented with the former situation rather than the latter. The LLC Agreement covers the field of this dispute. It created Juansrich's ownership interest, defined the parties' rights and duties under the agreement, and established the remedies available when a party failed to perform those duties. In addition, Juansrich's alleged loss is the receipt of a contractual benefit, reimbursement for the loss of its ownership interest in Metro. As a result, Juansrich's conversion claim fails as a matter of law. *See Exxon Mobil*, 192 S.W.3d at 128 ("The very nature of the dispute between the parties was whether appellees legally performed their contractual obligations under the GPA. Appellees have conclusively

11

demonstrated that Exxon Mobil's conversion claims were barred by application of the independent injury rule.").

Because Juansrich cannot recover on a conversion theory, its aiding and abetting theory of imposing joint and several liability also fails. *See Jessen v. Duvall*, No. 14-16-00869-CV, 2018 WL 1004659, at \*7 (Tex. App.—Houston [14th Dist.] Feb. 22, 2018, no pet.) (mem. op.) ("Therefore, if the underlying tort fails, an aiding and abetting claim related to the failed tort likewise fails."). In addition, to the extent Juansrich asserts aiding and abetting as an independent tort supporting recovery against certain appellants, we have previously rejected aiding and abetting as a valid legal theory. *Solis v. S.V.Z.*, 566 S.W.3d 82, 102–03 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (refusing to recognize aiding and abetting as a valid theory of recovery in Texas). We once again do so here.

We sustain Metro's first issue and reverse the trial court's judgment based on conversion and render judgment that Juansrich take nothing on either its conversion or its aiding and abetting causes of action.

## B. Unjust enrichment

The trial court also made findings supporting a recovery by Juansrich for unjust enrichment. Metro argues in its second issue that there can be no recovery for unjust enrichment because a contract covers all aspects of the claim. We agree. Here, as pointed out above, the LLC Agreement covers all aspects of Juansrich's unjust enrichment claim. In addition, there was a legitimate dispute regarding the amount owed under the LLC Agreement, which forecloses an unjust enrichment recovery. *See Industrial III, Inc. v. Burns*, No. 14-13-00386-CV, 2014 WL 4202495, at \*6 (Tex. App.—Houston [14th Dist.] Aug. 26, 2014, pet. denied) (mem. op.) ("Generally speaking, a party may not recover under quantum meruit or unjust enrichment if an express contract covers the services or materials

12

furnished."). As a result, we hold that Juansrich cannot recover under an unjust enrichment cause of action. *Id.*

**II.** **The trial court erred when it granted Juansrich's first and second Rule 166 motions requiring a new trial on Juansrich's breach of contract claims seeking payment for its ownership interest in Metro.**

As previously stated, Juansrich elected to recover under its conversion cause of action. The trial court, however, also found that Metro breached the LLC Agreement. It determined that Juansrich's breach of contract damages totaled (1) $7,844,676 for Metro's breach of its obligation to pay Juansrich for its membership units, and (2) $191,764.21 for member distributions for September and October of 2014. The first amount was initially based on the trial court granting the two Rule 166 motions and thereby determining that Juansrich's termination was non-adverse and that Metro was "Operational" as defined in the LLC Agreement when the termination occurred. Both are requirements that must be met before Juansrich can recover anything more than its initial capital contribution. The second amount was based on (1) undisputed evidence that Juansrich was still a member of Metro in September and October of 2014 and was entitled to a proportionate share of any distributions that occurred for those months, and (2) evidence admitted during the bench trial allegedly establishing the amount of those distributions. Metro argues in its third issue that neither amount can stand.

**A.** **The trial court could use Rule 166 in appropriate circumstances to resolve legal issues.**

We turn first to Metro's argument that Juansrich's use of Rule 166 here was improper. We conclude that the trial court had the authority under Rule 166, in appropriate circumstances, to resolve legal issues that could streamline a trial. *See* Tex. R. Civ. P. 166(g) (p); *JP Morgan Chase Bank v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653 (Tex. 2018) (stating that Rule 166(g) authorizes trial courts to

13

decide matters that, though ordinarily fact questions, have become questions of law "because reasonable minds cannot differ on the outcome."). Therefore, the question before us is not whether the procedure was authorized, but whether the circumstances were appropriate for such a ruling. We review a trial court's Rule 166 order de novo. *JP Morgan Chase Bank*, 546 S.W.3d at 653.

**B.**      **The trial court erred when it granted Juansrich's first Rule 166 motion.**

To be entitled to a return of anything more than its initial capital contribution, Juansrich initially had to establish that Juansrich's termination by Metro was non-adverse as defined in the LLC Agreement. An adverse termination occurs if the member materially breached the LLC Agreement. If the termination was "adverse," then Juansrich would only be entitled to a return of its initial capital contribution of $195,000. If the termination was non-adverse, then the redemption price for Juansrich's ownership interest would be determined by whether the termination occurred before or after Metro became "Operational" as defined in the LLC Agreement. If the termination occurs before Metro becomes "Operational," Juansrich would only be entitled to a return of its initial capital contribution, $195,000. If after, then the payment would be determined by performing a calculation laid out in article 4.3(g)(ii)(B) of the LLC Agreement.

Metro had alleged that Juansrich's termination was adverse because it had materially breached the LLC Agreement by violating (1) the non-compete, and (2) the one-third procedures rule. Juansrich argued that the trial court should grant its first Rule 166 motion because (1) the undisputed facts showed that it had complied with the one-third procedures rule, and (2) its prior summary judgment order had determined that the non-compete agreement was unenforceable. Juansrich argued compliance with the one-third procedures requirement was measured by the prior

14

fiscal year and Metro had admitted that Juansrich had complied with that requirement for 2013. Juansrich based this argument on the fact that the LLC Agreement required that compliance with the one-third of medical-income rule be measured "for the previous fiscal year or previous 12-month period." The trial court agreed and granted Juansrich's first Rule 166 motion.

On appeal, Metro argues, in part, that the trial court erred when it granted Juansrich's first Rule 166 motion because the LLC Agreement did not specify that, unlike the one-third of medical-income rule, compliance with the one-third procedures rule was measured by the prior fiscal year. Metro asserts this omission was intentional and the trial court erred when it added the annual compliance language into the number of procedures rule. We agree.

Courts are not authorized to rewrite agreements to insert provisions that the parties could have included or to imply terms for which they have not bargained. *Tenneco, Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996); *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 68 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Here, because the parties chose to include an annual measurement period for determining compliance with the one-third of medical-income rule, we must accept that the parties' omission of that language from the one-third of procedures rule was intentional. *See George Joseph Assets, LLC v. Chenevert*, 557 S.W.3d 755, 771 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("We will not read language into the agreement that the parties did not include."); *Bennett*, 489 S.W.3d at 70 ("We are not authorized to rewrite the parties' contract under the guise of interpreting it, even if one of the parties has come to dislike one of its provisions."). Therefore, because the parties did not include an annual time-period for measuring compliance with the one-third procedures rule, we construe the contract to require the measurement to occur over

15

a reasonable time period. *See Hewlett-Packard Co. v. Benchmark Electronics, Inc.*, 142 S.W.3d 554, 563 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) ("[W]hen a contract is silent regarding the date for an action to be taken, the courts will construe the contract as requiring such action be taken within a reasonable time."). "The question of reasonableness is usually one for the trier of fact." *Id.* We therefore hold that there was a fact question on whether Juansrich complied with the one-third procedures rule to be resolved by the trier of fact. Accordingly, the trial court erred when it ruled as a matter of law that Juansrich's termination was non-adverse and it granted Juansrich's first Rule 166 motion.

Metro also argues that the trial court erred when it partially based its first Rule 166 order on its previous summary judgment order declaring the covenant not to compete found in the LLC Agreement unenforceable. The trial court had previously determined that the covenant not to compete in the LLC Agreement was unenforceable because it failed to comply with the requirements set forth in subsection 15.50(b) of the Business and Commerce Code. *See* Tex. Bus. & Com. Code Ann. § 15.50(b) (establishing requirements that a covenant not to compete relating to the practice of medicine must comply with to be enforceable). Metro did not deny that the covenant not to compete found in the LLC Agreement did not include those restrictions. Metro instead argued that the LLC Agreement did not need to comply with the subsection 15.50(b) requirements because the legislature had amended the statute by adding subsection (c), which provides that "subsection (b) does not apply to a physician's business ownership interest in a licensed hospital or licensed ambulatory surgical center." *Id.* at § 15.50(c). As a result of this addition to the statute, Metro argued the covenant not to compete did not need to comply with subsection 15.50(b) and was otherwise enforceable against Dr. Francis. We agree with Metro.

16

This issue presents a question of statutory construction, which we review de novo. *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). When construing statutes, our primary objective is to give effect to the legislature's intent. *Willacy Cty. Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*, 555 S.W.3d 29, 38 (Tex. 2018). We rely on the plain meaning of the text as expressing legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or the plain meaning leads to absurd results. *Id.*

Here, it is undisputed that the covenant not to compete at issue here was contained in the LLC Agreement forming Metro, the entity owning and operating an ambulatory surgical center. As a result, pursuant to the plain language of the statute, the covenant not to compete in the LLC Agreement was not required to comply with the limitations found in subsection (b) of the statute. *See* Tex. Bus. & Com. Code Ann. § 15.50(c) (providing that subsection 15.50(b) of the Business and Commerce Code "does not apply to a physician's business ownership interest in a licensed hospital or licensed ambulatory surgical center"); *Novamed Surgery Ctr. of Tyler, L.P. v. Bochow*, No. 12-12-00159-CV, 2013 WL 2725544, at *4 (Tex. App.—Tyler June 12, 2013, no pet.) (mem. op.) ("Before the [2009] amendment, a noncompetition covenant involving a physician's ownership interest in an [ambulatory surgical center] required a buyout provision. Following the amendment, it did not. It is more than a 'clarification.' It is a change in the law.") (internal citations omitted). We therefore hold that the trial court erred when it ruled that the covenant not to compete in the LLC Agreement was unenforceable because it did not contain the limitations found in subsection 15.50(b) of the Business and Commerce Code and then relied on that ruling in part to determine that Metro's termination of Dr. Francis and Juansrich was non-adverse.

### C. The trial court erred when it granted Juansrich's second Rule 166 motion.

A judicial admission results when a party makes a statement of fact which conclusively disproves a right of recovery or a defense. *In re Estate of Guerrero*, 465 S.W.3d 693, 705 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). A judicial admission is a formal waiver of proof that dispenses with the production of evidence on an issue and bars the admitting party from disputing it. *Id.* The elements required for a judicial admission are: (1) a statement made during a judicial proceeding; (2) that is contrary to an essential fact or defense asserted by the person making the admission; (3) that is deliberate, clear, and unequivocal; (4) that if given conclusive effect, would be consistent with public policy; and (5) that is not destructive of the opposing party's theory of recovery. *Id.* at 705–06. An attorney's statements on behalf of a client may serve as a judicial admission. *Id.* at 705.

Juansrich argued that Metro's judicial admission occurred three separate times, all related to Metro's motion for summary judgment asserting that Juansrich's termination was adverse because Juansrich had materially breached the LLC Agreement. According to Juansrich, the first instance occurred in a supplemental motion for summary judgment which provided that "Here, Metro became operational on May 22, 2011." The second occurred when a Metro lawyer stated during the summary judgment hearing that Juansrich "withdrew within five years after Metro became operational." The third occurred in a Power Point slide stating that "Metro became operational on May 22, 2011." As explained above, "*O*perational" (emphasis added) was a defined term in the LLC Agreement. Operational however, also has a generic meaning when applied to a business, meaning the state of being functional. Here, none of Metro's alleged judicial admissions used "operational" with a capitalized "O." Based on these dual meanings, and the fact Metro used the uncapitalized version of operational, we

18

hold that it is not clear in what sense Metro used the term. Therefore, the three alleged admissions do not meet the requirement of being deliberate, clear, and unequivocal. *See Estate of Guerrero*, 465 S.W.3d at 706. We conclude that none of the statements rise to the level of a judicial admission as to the contractually defined term and therefore the trial court erred when it granted Juansrich's second Rule 166 motion.

Because we have determined that the trial court erred when it granted Juansrich's second Rule 166 motion, we need not reach Metro's argument that Francis waived the judicial admission by not objecting to all contrary evidence offered during the bench trial. Having determined that the trial court erred when it granted both of Juansrich's Rule 166 Motions, we sustain Metro's third issue in part, and conclude that Juansrich cannot simply elect to recover under its breach of contract cause action seeking payment on the value of its membership units. Instead, the breach of contract claim seeking payment for Juansrich's ownership interest must be remanded to the trial court for further proceedings.

### B.    Distributions

As stated above, the trial court found that Juansrich was entitled to $191,764.21 as its proportionate share of the December 2014 distribution allegedly made by Metro for earnings in September and October 2014, a time-period when Juansrich was still a Metro member. Metro argues that the evidence is legally insufficient to support the trial court's finding.

When an appellant challenges the legal sufficiency of the evidence on an adverse finding on an issue on which it did not have the burden of proof it must demonstrate on appeal that there is no evidence to support the adverse finding. *Univ. Gen. Hosp., L.P. v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 550 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In conducting a legal-sufficiency

19

review, we must consider all the record evidence in the light most favorable to the appealed finding and indulge every reasonable inference that supports it. *Id.* at 550–51 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 821–22 (Tex. 2005)). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *Id.* at 551. This Court must credit favorable evidence if a reasonable trier of fact could, and disregard contrary evidence unless a reasonable trier of fact could not. *Id.* The trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.*

We sustain a legal sufficiency (or no-evidence) issue only if the record reveals one of the following: (1) the complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Id.* Evidence that is so weak as to do no more than create a mere surmise or suspicion that the fact exists is less than a scintilla. *Id.* "The Texas Supreme Court has held that conclusory or speculative opinion testimony is incompetent evidence and cannot support a judgment." *Hong v. Integrated Eng'g, Inc.*, No. 14-06-00579-CV, 2008 WL 660650, at \*4 (Tex. App.—Houston [14th Dist.] March 11, 2008, pet. denied) (mem. op.) (internal quotations omitted).

Shelia Enriquez testified that she reviewed Metro's financial documents, including financial statements, bank records, and Metro's distribution schedule. These documents were admitted into evidence for the trial judge to review. Distributions for a particular month were normally made around the middle of the following month. Metro made a distribution for every month in 2014 except for the months of September and October. Enriquez opined that the November

20

distribution, made in December, included revenue attributable to the months of September and October.

Enriquez reviewed Metro's records and determined that there was sufficient cash in the company in both September and October to make distributions, yet none were made. Enriquez then looked at the November distribution (made in December) and concluded that $801,600 of the total distribution of $1,043,600.37 was attributable to income earned in September and October. According to Enriquez, Juansrich's percentage share of those earnings was 23.92268, which yields a payment for Juansrich of $191,764.21. During her trial testimony, Enriquez explained, in a step-by-step manner, how she arrived at this amount, a number derived from Metro's own records. We hold this testimony is not conclusory and is legally sufficient to support the trial court's award of that exact amount in the final judgment.

We therefore overrule this part of Metro's third issue on appeal and affirm the final judgment's award of $191,764.51 for missed distributions.

## III. The trial court erred when it awarded Dr. Francis attorney's fees pursuant to the Covenant Not to Compete Act.

In its final issue on appeal, Metro challenges the trial court's award of attorneys' fees to Dr. Francis pursuant to the Covenant Not to Compete Act.[3] *See* Tex. Bus. & Com. Code Ann. § 15.51(c) (authorizing a trial court to award attorney's fees in certain circumstances). The judgment's fee award was based on the trial court (1) granting Dr. Francis's motion for summary judgment declaring the non-competition provision in the LLC Agreement unenforceable; and (2) a

---

[3] There is no dispute on appeal that the Covenant Not to Compete Act is the sole basis pursuant to which the trial court awarded the $403,918.15 in attorney's fees and costs because Dr. Francis conceded on appeal "that the fees and costs were not recoverable under the [LLC] Agreement."

subsequent pretrial order granting Dr. Francis's motion seeking attorney's fees pursuant to Subsection C of the statute. *See id.* The trial court ordered Metro to pay Dr. Francis $380,471.50 in attorney's fees plus $23,446.65 in costs. The pretrial orders were then merged into the final judgment.

Metro argues in its final issue on appeal that the trial court erred when it awarded the attorney's fees because (1) the primary purpose of the LLC Agreement was not to obligate Dr. Francis to render personal services; and (2) even if the primary purpose was to render personal services, Dr. Francis failed to establish that Metro knew at the time of the execution of the LLC Agreement that the covenant did not contain reasonable limitations as to time, geographical area, and the scope of activity to be restrained.[4] Dr. Francis responds that the trial court did not abuse its discretion when it awarded the attorney's fees because he adequately established both statutory requirements.

Subsection 15.51(c) of the Covenant Not to Compete Act provides that a "court may award the promisor the costs, including reasonable attorney's fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant," but only if the promisor can establish that "the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services." *See* Tex. Bus. & Com. Code Ann. § 15.51(c). We conclude that Dr. Francis failed to meet this initial, statutory requirement for the recovery of fees.

This issue requires us to review the trial court's construction of the Covenants Not to Compete Act. Statutory interpretation presents a question of law

---

[4] As stated above, the final judgment also includes a second award of attorney's fees totaling $23,048.50 pursuant to section 3.152(c) of the Texas Business Organizations Code. Metro affirmatively stated in its appellate briefing that it does not challenge this award on appeal. We therefore affirm this part of the final judgment.

subject to de novo review. *Texas Law Shield, LLP v. Crowley*, 513 S.W.3d 582, 588 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). This issue also requires us to review the trial court's construction of the LLC Agreement, the contract at issue in this dispute. If a contract is not ambiguous, it is construed as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). We review a trial court's legal conclusions de novo. *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 790 (Tex. App.—Houston [14th Dist.] 2016, no pet.). When performing a de novo review, we exercise our own judgment and redetermine each legal issue. *Id.* Neither side has argued the LLC Agreement is ambiguous and we agree that it is not. *See Lane-Valente Indus. (Nat'l), Inc, v. J.P. Morgan Chase Bank, N.A.*, 468 S.W.3d 200, 205 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (stating that deciding whether a contract is ambiguous is a question of law). We therefore review the trial court's implied legal conclusion that the primary purpose of the LLC Agreement was to obligate the members to provide personal services de novo.

Here, it is undisputed that Dr. Francis was never an employee of Metro and never had an employment contract with Metro. Instead, the only contract at issue here is the LLC Agreement, which the parties signed in order "to develop, own, and operate an ambulatory surgical center." The LLC Agreement has lengthy provisions establishing how doctors could become and remain members of the company. The LLC Agreement also covered the management of the surgical center. We conclude that the primary purpose of the LLC Agreement, as its title and content implies, was to create and then regulate a limited liability company for the purpose of developing and operating an ambulatory surgical center from which its members could ultimately derive profits. *See Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F.Supp.2d 598, 678 (S. D. Tex. 2010) ("The language of the

23

Agreement shows that the primary purpose was not to obligate Bell to render services to Rimkus."); *CSL Prop. Mgmt. Co. v. Thyssenkrupp Elevator, Co.*, No. 01-11-00665-CV, 2013 WL 396252, at *6 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, no pet.) (mem. op.) ("A primary purpose of the assumption agreement, as evidenced on the face of the agreement, is to protect Thyssenkrupp from the risks associated with Greatland's removal of Emergency Services as the general contractor for the project after the project commenced, especially with respect to the payment of the contract price."); *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.*, 48 S.W.3d 865, 877 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (holding in a legal malpractice case that the Statute of Frauds applied to underlying contract because, after "considering all the terms of the third contract, it is clear that the primary purpose of the contract was to secure interests in oil and gas lease" rather than the acquisition of geologic information gathered by a petroleum geologist). We conclude that the primary purpose of the LLC Agreement was not to obligate its members to render personal services. Accordingly, we hold that Dr. Francis failed to meet the first requirement for the recovery of attorney's fees pursuant to the Covenant Not to Compete Act. *See* Tex. Bus. & Com. Code Ann. § 15.51(c) ("If the primary purpose of the agreement to which the covenant is ancillary is to obligate the promisor to render personal services . . . the court may award the promisor the costs, including reasonable attorney's fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant."). We sustain Metro's fourth issue, reverse the trial court's award of attorney's fees and costs pursuant to the Covenants Not to Compete Act and render judgment that Dr. Francis take nothing on that claim.

## CONCLUSION

Because Metro has not challenged the trial court's award of $23,048.50 in

24

attorney's fees pursuant to section 3.152(c) of the Texas Business Organizations Code, we affirm that part of the trial court's final judgment. Having sustained Metro's first and second issues on appeal, we reverse the trial court's final judgment based on Juansrich's conversion cause of action and render judgment that Juansrich take nothing on its conversion, aiding and abetting, and unjust enrichment causes of action. Having reversed and rendered a take-nothing judgment on Juansrich's tort causes of action and having sustained the part of Metro's third issue challenging the trial court's Rule 166 orders which prevent Juansrich from electing to recover on its breach of contract cause of action seeking payment for the value of its membership units, we remand that claim to the trial court for further proceedings. Having overruled the part of Metro's third issue challenging the sufficiency of the evidence supporting the award of $191,764.21 for missed distribution payments, we affirm that part of the final judgment. Having sustained Metro's fourth issue challenging the part of the trial court's final judgment awarding attorney's fees to Dr. Francis pursuant to the Covenants Not to Compete Act, we reverse and render judgment that Dr. Francis take nothing on that claim.


/s/    Jerry Zimmerer
        Justice


Panel consists of Chief Justice Christopher and Justices Jewell and Zimmerer.

25